Alison D. GRIEVE, fka Alison
D. Suchoski, Plaintiff,

v.

GENERAL AMERICAN LIFE INSURANCE COMPANY and Integrity Life Insurance Company, Defendants.

No. 2:98–CV–57.

United States District Court,
D. Vermont.

June 8, 1999.

Michael J. Harris, Sutherland, Collins, McMahon & Harris, Inc., Burlington, VT, for plaintiff.

James W. Coffrin, Pierson, Wadhams, Quinn & Yates, Burlington, VT, William Jay Hunter, Jr., Middleton & Teutlinger, Louisville, KY, for defendants.

## OPINION AND ORDER

SESSIONS, District Judge.

In this declaratory judgment action, Defendants General American Life Insurance Company ("General American") and Integrity Life Insurance Company ("Integrity") seek summary judgment on the issue of whether an individual receiving structured settlement payments is bound by law and her agreement not to sell, assign or otherwise transfer her right to payment in exchange for a lump sum. Plaintiff Alison Grieve has cross moved for summary judgment. The parties agree that there are no disputed issues of material fact, and that the issue is ripe for disposition on summary judgment. For the reasons that follow, this Court holds that Grieve's agreement must be enforced as written. Defendants' motion for summary judgment (paper 24) is granted; plaintiff's motion for summary judgment (paper 29) is denied.

### I. *Factual Background*

On April 24, 1990, Alison Suchoski (now Grieve) was severely injured while riding a bicycle. She was 17 years old at the time. She and her mother, Linda Newton, brought a claim against the owner of the bike and his family. Concord Group Insurance Company ("Concord") was the liability insurer of the family of the bike owner. Grieve, her mother and Concord entered into a structured settlement agreement on December 24, 1991, which provided for payments to Grieve of $1,021 per month for 30 years or for her life, whichever is longer, and for nine lump-sum payments every three years, of amounts beginning with $2,500 and in-

creasing to $15,000. The agreement was signed by Grieve, her mother and their lawyer. Grieve was 19½ when she signed.

The settlement agreement provided that

> the periodic payments cannot be accelerated, deferred, increased or decreased by [Grieve] or any Payee; nor shall [Grieve] or any Payee have the power to sell, mortgage, encumber, or anticipate the periodic payments, or any part thereof, by assignment or otherwise.

Settlement Agreement, § 3.1.

There was one exception to this provision: that Concord make a "qualified assignment" within the meaning of § 130(c) of the Internal Revenue Code of 1986 as amended of its obligation to make the periodic payment to General American. Settlement Agreement, § 5.1. General American was given the authority to fund the periodic payments by purchasing an annuity policy from Integrity. *Id.*, § 6. General American was to be the sole owner of the annuity policy, with all rights of ownership. *Id.* Integrity was to mail the payments directly to Grieve. *Id.*

The assignment took place as described on December 24, 1991. All parties signed the Qualified Assignment, which also contained the proviso that "none of the Periodic Payments may be accelerated, deferred, increased or decreased, nor may any of them be anticipated, sold, assigned or encumbered." Qualified Assignment, ¶ 3. The Qualified Assignment contains the statement that "[t]he parties desire to effect a 'qualified assignment' in accordance with section 130(c) of the Internal Revenue Code of 1986, as amended." *Id.*, ¶ B.

Effective December 27, 1991, General American purchased the annuity from Integrity. The annuity shows General American as the owner of the annuity, and also states that Grieve is not the owner, has no ownership rights in the contract, and may not assign or otherwise use it as

collateral. Annuity, p. 1. The document states further that "[n]o amounts payable under this contract to a payee other than [the contract owner] may be assigned by that payee ..." Annuity, p. 5.

Grieve is now 26. She was rendered a paraplegic by the accident. Her personal and financial circumstances have worsened since she made her settlement agreement. She has chronic medical complications, which have required numerous hospitalizations. As a result she has been unable to maintain steady employment. She has substantial debts.

In September 1997, Grieve entered into a "purchase agreement" with Singer Asset Financial Co. ("Singer"), whereby she would give up 120 months of payments of $750 and lump sum payments of $13,000 ($103,000 over ten years) in exchange for $41,800 payable immediately. On Singer's instructions, Grieve wrote to Integrity on Singer's behalf asking that her address be changed to a post office box in Buffalo, New York. As a condition of changing the address to which the payments were sent, Integrity asked Grieve for an affidavit declaring that she was not assigning her rights under the annuity. Instead, on January 22, 1998 Grieve filed her complaint for declaratory relief in the Superior Court of the State of Vermont, Chittenden County, requesting that the Defendants be ordered to honor her assignment to Singer.[1] The Defendants timely removed the action to this Court.

In November 1998, the purchase agreement never having been completed, Grieve and Singer entered into a new "loan agreement." Under this arrangement, Grieve receives $39,862 from Merrick Bank Corporation, a Utah industrial bank. The loan is to be assigned to Singer. In exchange Grieve gives up 180 monthly payments of $510 and $13,000 in lump sum payments, for a total of $104,800. This deal cuts Grieve's monthly income from the annuity

---

1. Although Alison Grieve is the only named plaintiff in this action, her counsel at oral argument stated that he represented the interests of both herself and Singer, and that Singer was responsible for Grieve's legal fees.

in half for fifteen years. The interest rate on the loan is 18.88%, compounded daily.

The Defendants argue that the Settlement Agreement, the Qualified Assignment and the Annuity expressly prohibit Grieve from selling or assigning her rights to payments under the structured settlement, that Vermont law does not permit such assignments, and that sale or assignment of periodic payments from a structured settlement would violate public policy. Grieve argues that the restrictions against sale or assignment are unenforceable.

## II. *Legal Standards*

Summary judgment is appropriate when there is no genuine issue as to any material fact, and the moving party is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56(c); *Alexander & Alexander Services, Inc. v. These Certain Underwriters at Lloyd's, London, England,* 136 F.3d 82, 86 (2d Cir.1998) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Jurisdiction of this matter is based on diversity, 28 U.S.C. §§ 1332, 1441, and the Court applies Vermont law to the substantive issues. *Erie R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).[2]

## III. *Discussion*

The parties do not dispute that the Settlement Agreement, the Qualified Assignment and the Annuity each expressly prohibit the sale or assignment of Grieve's rights to payments under the structured settlement. Nevertheless, Grieve wants a ruling that the nonassignability provisions are unenforceable under common law.

The annuity contract states that Grieve, as a payee other than the owner of the contract, may not assign any amounts payable under the contract. Under Vermont law, an annuity contract "may be assigna-

ble or not assignable, as provided by its terms." Vt. Stat. Ann. tit. 8, § 3713(a) (1984). The terms of the annuity contract unambiguously prohibit Grieve from assigning her rights under the contract or otherwise using it as collateral. Moreover, as Grieve is not the owner of the annuity contract, she has no ownership rights in the contract, legally assignable or otherwise. *See Western United Life Assurance Co. v. Hayden,* 64 F.3d 833, 838 (3d Cir. 1995). Grieve has conceded this point, and claims that she seeks only to invalidate the nonassignability clause of her settlement agreement.

In general in Vermont a debt or agreement to make future payments may be assigned. *See Hebert v. Jarvis & Rice and White Ins., Inc.,* 134 Vt. 472, 476, 365 A.2d 271, 273 (1976); *Wescott v. Potter,* 40 Vt. 271, 274 (1867); *Spafford v. Page,* 15 Vt. 490, 493–94 (1843). Under Vermont law, however, unambiguous terms in a contract are given effect in accordance with their plain, ordinary and popular sense. *Lupien v. Citizens Utilities Co.,* 159 F.3d 102, 105 (2d Cir.1998).

The Restatement of the Law of Contracts (Second) recognizes the validity of assignments, but with three important exceptions:

A contractual right can be assigned unless

(a) the substitution of a right of the assignee for the right of the assignor would materially change the duty of the obligor, or materially increase the burden or risk imposed on him by his contract, or materially impair his chance of obtaining return performance, or materially reduce its value to him, or

(b) the assignment is forbidden by statute or is otherwise inoperative on grounds of public policy, or

---

**2.** All parties agree that Vermont law applies to this case. The documents were executed in Vermont, Grieve and her mother were Vermont residents at the time, and the settlement agreement provides that Vermont law governs its interpretation. Settlement Agreement, ¶ 11.

(c) assignment is validly precluded by contract.

Restatement, Second, Contracts § 317(2) (1981). Each of the above exceptions to the general assignability of rights under a contract applies in this case.

■ The substitution of Singer for Grieve as the recipient of Grieve's periodic payments would materially increase a risk to General American, and consequently would materially reduce the contract's value. In 1983 the Periodic Payment Settlement Act ("PPSA") was enacted, amending the Internal Revenue Code to make clear that periodic payment of personal injury damages are excludable from a taxpayer's gross income. Section 104(a)(2) of Title 26 of the United States Code provides that gross income does not include personal injury damages received either as lump sums or as periodic payments. 26 U.S.C.A. § 104(a)(2) (1988 and Supp.1999). Section 130 of Title 26 permits an entity who undertakes the responsibility for making periodic payments to exclude from its gross income the amount received for doing so, to the extent that the amount does not exceed the cost of the funding asset, typically an annuity contract. 26 U.S.C.A. § 130 (1988 and Supp.1999).

The settlement agreement in this case was drafted to enable the parties to take advantage of these tax benefits. The parties agreed to a "qualified assignment" of Concord's responsibility to make periodic payments to Grieve, as defined in Section 130(c). In order for the assignee, General American, to qualify for the tax benefits, it had to assume the liability from Concord. 26 U.S.C.A. § 130(c)(1). In addition, the periodic payments had to be "fixed and determinable as to amount and time of payment," could not be "accelerated, deferred, increased, or decreased by the recipient" of the payments, and had to be "excludable from the gross income of the recipient" under section 104(a). 26 U.S.C.A. § 130(c)(2)(A), (B), (D).

If Singer were the recipient of the periodic payments, it would not be entitled to exclude the sums received from its gross income under section 104(a). General American would thus lose its eligibility for favorable tax treatment under section 130. The practical implications of this loss are open to speculation: no party to this suit could say whether General American would in fact suffer adverse tax consequences. The Court is satisfied, however, that the change of recipient materially increases a risk to General American, and as a result materially reduces the value of the contract to it. *See Johnson v. First Colony Life Ins. Co.*, 26 F.Supp.2d 1227, 1229 & n. 4 (C.D.Cal.1998) (nonassignability clause benefits defendant insurance companies).

■ Moreover, the documents' prohibitions of assignment are valid, enforceable terms. Grieve argues that the prohibition against assignability is invalid because Article 9 of the Uniform Commercial Code, governing secured transactions, contains a provision which nullifies anti-assignment terms in contracts between debtors and prospective assignors of those debts. Section 9–318(4) provides:

> A term in any contract between an account debtor and an assignor is ineffective if it prohibits assignment of an account or prohibits creation of a security interest in a general intangible for money due or to become due or requires the account debtor's consent to such assignment or security interest.

Vt. Stat. Ann. tit. 9A, § 9–318(4) (1994).

Vermont's Article 9 does not apply "to a transfer of an interest or claim in or under any policy of insurance," except with regard to proceeds from claims against casualty policies, not at issue here. Vt. Stat. Ann. tit. 9A, § 9–104(g) (1994 and Supp. 1998). Although annuity contracts differ in important respects from life insurance policies, *see NationsBank of North Carolina, N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 264, 115 S.Ct. 810, 130 L.Ed.2d 740 (1995) (annuity functions more like investment than like insurance);

*Helvering v. Le Gierse,* 312 U.S. 531, 541, 61 S.Ct. 646, 85 L.Ed. 996 (1941) (insurance and annuity are opposites; insurance looks to longevity, annuity to transiency), the Vermont statutes governing banking and insurance place annuity contracts within the broad definition of "insurance policy." Section 4901 of title 8 defines "insurance policy" as "a policy or contract covering any kind of insurance described in this title . . . ." Vt. Stat. Ann. tit. 8, § 4901 (1993). Annuity contracts are defined in section 3717 of title 8. Vt. Stat. Ann. tit. 8, § 3717 (1984). *See also* Vt. Stat. Ann. tit. 8, §§ 3701–3859 (1984 and Supp.1999) (statutes governing "life insurance policies and annuity contracts"); Vt. Stat. Ann. tit. 8, § 4722(3) (1993) (insurance "policy" or "contract" includes annuity contracts for purposes of regulating insurance trade practices); Vt. Stat. Ann. tit. 8, §§ 8201–8208 (Supp.1999) (statutes regulating transfer and assumption of insurance contracts include annuity contracts).

Section 9–318(4) of the Uniform Commercial Code therefore does not apply to the annuity contract. *See Wonsey v. Life Ins. Co.,* 32 F.Supp.2d 939, 942 (E.D.Mich. 1998). Nor can it apply to the Settlement Agreement. Section 9–104(g)'s exclusion applies to interests or claims in *or under* a policy of insurance. Once the qualified assignment to General American was effected, General American became the sole obligor with respect to the periodic payments to Grieve. As contemplated by the parties, General American funded its obligation through the purchase of an annuity policy from Integrity. Any right to periodic payments under the Settlement Agreement is a right to receive payments from the annuity. Grieve's right to periodic payments under the Settlement Agreement is an interest arising under a policy of insurance; her attempt to assign that interest is excluded from Article 9's coverage.

■ Grieve has failed to establish any statutory, common law or public policy basis to invalidate the terms of her structured settlement. In addition to the legal justifications for enforcing the contractual terms as written, as a matter of public policy this Court will not order the defendants to honor Grieve's purported assignment of contract rights to Singer.

■ By enacting the PPSA, Congress expressed its support of structured settlements, and "sought to shield victims and their families from pressures to prematurely dissipate their recoveries." 145 Cong. Rec. S5281-01 (daily ed. May 13, 1999) (statement of Sen. Chafee). Structured settlement payments are non-assignable in order "to preserve the injured person's long-term financial security." *Id.* Companies such as Singer take advantage of these individuals in factoring transactions, purchasing their periodic payments in return for a deeply discounted lump sum payment. Factoring company purchases of structured settlement payments "so directly subvert the Congressional policy underlying structured settlements and raise such serious concerns for the injured victims," that bills have been proposed in the Senate and the House to penalize companies which engage in such transactions. *Id.*

As Grieve has stated, she is currently in substantial financial need. The Court is asked to enforce a transaction which will place her in significantly greater financial need, by cutting her income stream in half for the next fifteen years. Grieve, like any other citizen, is free to make agreements which this Court might deem unwise. But this Court will not lend its approval to the voiding of unambiguous, bargained-for contract terms in order to enable Singer to profit, at an exorbitant rate of interest, from Grieve's financial distress.

Accordingly, the defendants' motion for summary judgment (paper 24) is granted; the plaintiff's motion for summary judgment (paper 29) is denied.