771 A.2d 1208

CAROL OWEN, PLAINTIFF–APPELLANT, v. CNA IN-SURANCE/CONTINENTAL CASUALTY COMPA-NY, DEFENDANT–RESPONDENT.

Argued February 26, 2001—Decided May 31, 2001.

*Sherry L. Foley*, argued the cause for appellant (*Foley & Foley*, attorneys; *Ms. Foley* and *Timothy J. Foley*, of counsel and on the briefs).

*Francis X. Manning*, argued the cause for respondent (*Stradley, Ronon, Stevens & Young*, attorneys; *Mr. Manning* and *Lee A. Rosengard*, of counsel and on the briefs).

*Mark S. Melodia*, submitted a brief on behalf of amicus curiae, The National Association of Settlement Purchasers (*Reed Smith*, attorneys; *Mr. Melodia, Daniel Mateo* and *Jennifer L. Bradshaw*, on the brief).

The opinion of the Court was delivered by

STEIN, J.

This appeal involves a tort victim who brought an action against a liability insurer for a declaratory judgment that the non-assignment clause in a structured settlement agreement was unenforceable. The trial court granted summary judgment in favor of the tort victim, holding that under current law the non-assignment clause was unenforceable. The Appellate Division reversed, concluding that the enforceability of the non-assignment clause depended on its materiality to the primary purposes of the settlement agreement and remanding the matter for further fact finding on that question. One member of the appellate panel dissented, stating that "a holding that the assignment in this case was ineffective has no current legitimate provenance in law." The tort victim appealed as of right based on the dissent below. *R.* 2:2-1(a)(2). The specific issue is whether the non-assignment clause in the structured settlement agreement at issue is enforceable.

I

In September 1983, plaintiff Carol Owen (Owen) signed a release in favor of parties she had sued in a personal-injury action arising out of a slip-and-fall accident at a Bamberger's Store in East Brunswick, New Jersey. *Owen v. CNA Ins./Continental*

*Cas. Co.*, 330 *N.J.Super.* 608, 611, 750 *A.*2d 211 (App.Div.2000). In connection with that release, Owen entered into a settlement agreement with the tortfeasor's insurer, Continental Casualty Corporation (Continental). *Ibid.* Under the terms of the settlement agreement, Owen was entitled to receive an initial lump sum payment of $10,000, attorney's fees of $15,000, and five deferred periodic payments totaling $81,067.24. *Ibid.* The periodic payments were scheduled as follows: December 21, 1986—$6,505.48; December 21, 1991—$9,558.68; December 21, 1996—$14,044.84; December 21, 2001—$20,636.48; December 21, 2006—$30,321.76. The non-assignment provision of the settlement agreement stated:

> The claimant shall have the right to change the Contingent Payee at any time during the term of this Agreement by filing written notice with the Company, such change to be effective when accepted by the Company in writing as of the date such notice was signed, except as to any payments made by the Company before such change was accepted.

> To the extent provided by law, the aforesaid deferred lump sum payments shall not be subject to assignment, transfer, commutation, or encumbrance, except as provided herein.

Because of mounting medical bills due to illness unrelated to her lawsuit, in December 1997 Owen entered into a "Purchase and Sale Agreement" with Metropolitan Mortgage and Securities Company (Metropolitan) pursuant to which she agreed to " 'sell, convey, transfer and assign' to Metropolitan all her 'rights and benefits' under the settlement agreement with [Continental] for $8,520.20." *Id.* at 611, 750 *A.*2d 211. At the time of the assignment to Metropolitan, Owen was entitled to receive the 2001 ($20,636.48) and 2006 ($30,321.76) payments under the structured settlements. *Ibid.* However, the parties dispute whether Owen sold both remaining payments or only the 2001 payment to Metropolitan. *Id.* at 610, 750 *A.*2d 211. Under the assignment agreement, Owen also agreed (1) to defend, indemnify, and hold Metropolitan harmless for any claim that her periodic payments were not assignable and (2) to "order and conduct [her] affairs [so] as to prevent the assertion of any claim that the Benefits were not assignable." *Id.* at 611–12, 750 *A.*2d 211 (internal quotations omitted).

In January 1998, in furtherance of the assignment, Owen sent Continental a notarized letter directing it to send "all future payments and other mail" to a new address in Syracuse, New York. Continental responded by sending Owen a copy of the settlement agreement and noting that the deferred periodic payments were not subject to assignment. After Owen's attorney wrote three letters to Continental seeking confirmation that Continental had changed the address, Continental in turn requested confirmation that Owen resided at the Syracuse address. Owen's counsel responded by enclosing a draft letter of complaint to the New Jersey Department of Banking and Insurance (Department of Insurance) and indicated that she would file the complaint in the absence of immediate written acknowledgment that Continental had changed Owen's address. In another letter, Owen's counsel indicated that Owen's place of residence was "irrelevant" and demanded again that Continental change the address to which future payments were to be sent. In response, Continental then advised Owen's counsel that

> Continental Casualty Company is required to make payments to the claimant. The payments are not assignable by the claimant. Accordingly, the payments are always sent to the claimant's actual address. The Company does not send payments to a street address at which the claimant does not reside.

Subsequently, Owen filed a complaint with the Department of Insurance, but the Department took no action.

In April 1998, Owen filed a complaint in the Law Division seeking a declaratory judgment compelling Continental to acknowledge the address change and declare the non-assignment clause in the settlement agreement void and unenforceable, thus permitting her to complete her transaction with Metropolitan. *Id.* at 612, 750 *A.*2d 211. In response to Owen's motion for summary judgment, Continental filed an affidavit by Susan Goulet, Continental's Vice President, explaining Continental's reasons for including non-assignment provisions in all their structured-settlement agreements. *Ibid.* The Law Division granted Owen's motion for summary judgment. The Appellate Division reversed and remanded, with one member of the panel dissenting. *Id.* at

621, 750 A.2d 211. Relying on legal commentaries and federal and out-of-state case law, the Appellate Division concluded that the provisions of Article 9 of the Uniform Commercial Code (U.C.C.) did not require that the non-assignment provision of the structured-settlement agreement be invalidated, noting that tort settlement proceeds were encompassed within the express exclusion of tort claims from the provisions of Article 9 that invalidate non-assignment provisions. Id. at 616, 750 A.2d 211.

The Appellate Division set forth Continental's reasons for considering the non-assignment clause a "main purpose" of the structured-settlement agreement. Id. at 617, 750 A.2d 211. Those reasons included ensuring Owen a continued income stream, preventing dissipation of the settlement proceeds, guarding against the potential loss of the tax-free treatment that accompanies structured settlements, and protecting Continental against the potential tax-reporting obligations that it bargained to avoid. Id. at 617–18, 750 A.2d 211 (citing Chelsea–Wheeler Coal Co. v. Marvin, 134 N.J. Eq. 432, 437, 35 A.2d 874 (E. & A.1944) (holding that prohibition against assignment may be disregarded when it is not the "main purpose" of the contract)). The Appellate Division also noted that Continental "has a right to contract in an effort to avoid legitimate risks," id. at 618 n. 7, 750 A.2d 211, and concluded that "the trial judge improperly granted summary judgment to [Owen] in the absence of further development of both the materiality of the anti-assignment provision and the legitimacy or reasonableness of the risks perceived to flow to [Continental] if the assignment were enforceable." Id. at 619, 750 A.2d 211. Accordingly, the Appellate Division remanded the case for further proceedings "relating to the materiality and enforceability of the provision governing the non-assignability of the structured settlement." Id. at 621, 750 A.2d 211.

In dissent, Judge Kestin noted that the official U.C.C. comment and the New Jersey Study Comment to N.J.S.A. 12A:9–318(4) make clear that section 9–318(4) was designed to nullify the "old" rule that generally prohibited assignments and to establish instead

the "modern" rule favoring assignability whenever possible. *Id.* at 626, 750 *A.2d* 211 (Kestin, J., dissenting). Taking into account the U.C.C., statutory law, and case law, the dissent concluded that "a holding that the assignment in this case was ineffective has no current legitimate provenance in law." *Id.* at 627, 750 *A.2d* 211. Moreover, the dissent could find no valid reason for limiting a person's access to the current monetary value of a contractual right due to mature in the future. *Ibid.* Finally, the dissent rejected the "patronizing or paternalistic justifications" offered to limit the assignment. *Ibid.*

## II

Although our statutes do not contain specific provisions regulating the transfer of structured settlement rights,[1] effective January 1, 1963, the Uniform Commercial Code (U.C.C.) became the

---

[1] We note that in February 2000, Senate Bill S–944 and its companion Assembly Bill A–2146 were introduced in the New Jersey Senate and Assembly. *On December 4, 2000, the Senate adopted its substitute for S–944. On May 24, 2001 the General Assembly passed its substitute for A–2146.* Further action on those bills is pending. Relevant language in those bills prohibits transfer of structured settlement rights except under certain circumstances:

> 4. No direct or indirect transfer of structured settlement payment rights shall be effective and no structured settlement obligor or annuity issuer shall be required to make any payment directly or indirectly to any transferee of structured settlement payment rights unless the transfer has been approved in advance in a final court order or order of a responsible administrative authority based on express findings by the court or responsible administrative authority that:
> a. the transfer is in the best interest of the payee, taking into account the welfare and support of the payee's dependents;
> b. the payee has been advised in writing by the transferee to seek independent professional advice regarding the transfer and has either received the advice or knowingly waived the right to seek that advice in writing; and
> c. the transfer does not contravene any applicable statute or the order of any court or other government authority.

[Senate Substitute for Senate Committee Substitute for S. 944, 209th Legis. (Dec. 4, 2000); Assembly Committee Substitute for A. 2146, 209th Legis. (final passage on May 24, 2001).]

governing statutory law in New Jersey regulating commercial transactions throughout the State. *N.J.S.A.* 12A:10–106. A threshold issue is whether Article 9 of the U.C.C. affects the validity of Continental's non-assignment clause. *N.J.S.A.* 12A:9–318(4) provides:

> A term in any contract between an account debtor and an assignor is ineffective if it prohibits assignment of an account or prohibits creation of a security interest in chattel paper or a security interest in a general intangible for money due or to become due or requires the account debtor's consent to the assignment or security interest.

Although that provision invalidates contractual non-assignment provisions, *N.J.S.A.* 12A:9–104(k) provides that Article 9 does not apply "[t]o a transfer in whole or in part of any claim arising out of tort." Because the meaning of "any claim arising out of tort" is not explicitly defined in the statute, whether or not section 9–104(k)'s exclusion applies to the proceeds of tort claims has become a highly controversial issue. The Appellate Division determined that the exclusion in *N.J.S.A.* 12A:9–104(k) also applied to the proceeds of tort claims. *Owen, supra*, 330 *N.J.Super.* at 616, 750 *A.*2d 211. However, no clear majority rule exists concerning the application of Article 9 to tort claim proceeds. *Barclays Bus. Credit, Inc. v. Four Winds Plaza Partnership*, 938 *F.Supp.* 304, 308 (D.Vi.1996).

*Barclays* sets forth the arguments that support each side of the issue. The *Barclays* court recognized that courts have drawn a distinction between a tort claim and the proceeds from a settlement of that tort claim, suggesting that "whereas § 9–104(k) excludes transfers of tort claims, it does not exclude tort settlement proceeds." *Id.* at 308 (emphasis omitted). Judge Brotman explained that the philosophy underlying that view is that "a right to payment that derives from a tort claim" is contractual in nature, and therefore is analytically distinguishable from the tort claim itself. *Ibid.* The court also cited an analysis of the issue by Professor Harold R. Weinberg, who observed that

> [i]n the typical sequence of events, settlement occurs at some point after suit is filed but prior to judgment. In the settlement a tort victim obtains a contractual right to payment from the tortfeasor, or his insurer, which constitutes a new form

of intangible personal property derived from the original tort claim. When the tortfeasor or his insurer issues a check to satisfy this obligation another form of derivative property has come into existence—the victim-payee's rights on the check. Still another intangible derivative right is produced when the check is cashed or deposited—the rights in the fund. While the security assignment of the original tort claim is not within the scope of Article Nine, derivative settlement ·rights are excluded only if they are 'claim[s] arising out of tort.' Therefore, these rights could constitute original collateral within Article Nine.

[*Id.* at 308–09.]

In contrast, other legal commentators have concluded that "[b]asic principles of statutory construction lead to the conclusion that section 9–104(k)'s exclusion applies not only to tort claims, but also to the proceeds of such a claim." Amanda K. Esquibel, *An Article 9 Primer Regarding Uninsured Collateral Destroyed by a Tortfeasor,* 46 *U. Kan. L.Rev.* 211, 214 (1998).

█ Putting to one side the Article 9 debate and focusing instead on New Jersey assignment law, we note that *N.J.S.A.* 2A:25–1 provides that "all judgments and decrees recoverable in any of the courts" in New Jersey are assignable. Thus, New Jersey law generally permits the assignment of settlement proceeds unless the parties have expressly agreed otherwise. *Chelsea–Wheeler Coal Co. v. Marvin,* 134 *N.J. Eq.* 432, 35 *A.*2d 874 (E. & A.1944), established the common-law doctrine that a contractual provision that prohibits the assignment of rights under a contract may be disregarded when it is not the main purpose of the contract. *Id.* at 437, 35 *A.*2d 874. In *Chelsea–Wheeler,* Arthur Parker purchased a life insurance policy in 1923 that provided that the proceeds were to be paid to his daughter, if his wife were not living on his death. *Id.* at 433–34, 35 *A.*2d 874. The "designation of beneficiary" provision of the policy stated: "No beneficiary or assignee hereunder shall have the power of commutation, alienation or assignment of the installments or any of them unless by written permission of the insured...." *Id.* at 434, 35 *A.*2d 874 (internal quotations omitted). That designation also provided that the proceeds were to be paid to the beneficiary in monthly installments over a period of years. *Ibid.*

When Parker and his wife were killed in a common accident in 1939, Parker was indebted to Chelsea–Wheeler Coal Company. *Ibid.* His daughter also was executrix of her father's estate. *Id.* at 433, 35 *A.*2d 874. Chelsea–Wheeler sued the daughter alleging dissipation of the estate's assets and obtained a judgment against her. *Id.* at 434, 35 *A.*2d 874. Chelsea–Wheeler also filed a petition to have the daughter removed as executrix. *Ibid.* Under the pressure of the judgment and litigation, the daughter agreed to assign her monthly payments under her father's life insurance policy to Chelsea–Wheeler to satisfy the judgment. *Id.* at 434–35, 35 *A.*2d 874. The insurance company challenged the assignment.

In considering the enforceability of the assignment, the Court of Errors and Appeals observed that "[e]ven though a contract may prohibit assignment, such prohibition may be disregarded where it is not the main purpose of the contract, but is a mere incident to such main purpose." *Id.* at 437, 35 *A.*2d 874. The Court then applied that standard to the evidence, concluding that the non-assignment provision of the insurance policy was enforceable:

> The determination of the question of the validity of the assignment rests in the intention of Arthur Parker and the insurance company. His wife and daughter were the natural objects of his bounty and it was but a husbandly and paternal desire on his part to make provision for their support after his death. In fulfillment of that desire and doubtless to protect them from the results of their own imprudence or improvidence, he provided for the payment of the insurance fund in fixed installments over a period of time and prohibited the beneficiary from alienating or assigning the installments. For the next sixteen years he apparently was of the same mind since he made no change in the policy provisions, although the contract reserved that right to him. Then occurred the catastrophe resulting in the death of his wife and himself. It seems clear to us that the primary intent of the parties to the contract of insurance was to afford a modest but regular income to the widow or daughter.
>
> [*Id.* at 437–38, 35 *A.*2d 874.]

Since the 1944 decision in *Chelsea–Wheeler,* we have not again considered the effect of contractual provisions limiting or prohibiting assignments. However, in *Garden State Buildings L.P. v. First Fidelity Bank, N.A.,* 305 *N.J.Super.* 510, 702 *A.*2d 1315 (App.Div.1997), the Appellate Division addressed the issue, relying

primarily on Section 322 of the Restatement of Contracts, which states in pertinent part:

(2) A contract term prohibiting assignment of rights under the contract, unless a different intention is manifested,

(a) does not forbid assignment of a right to damages for breach of the whole contract or a right arising out of the assignor's due performance of his entire obligation;

(b) gives the obligor a right to damages for breach of the terms forbidding assignment but does not render the assignment ineffective;

(c) is for the benefit of the obligor, and does not prevent the assignee from acquiring rights against the assignor or the obligor from discharging his duty as if there were no such prohibition.

[*Restatement (Second) of Contracts* § 322 (1981).]

The crucial phrase in section 322 is "unless a different intention is manifested." Courts diverge, however, regarding the standard for determining when parties to a contract have sufficiently manifested an intention to prohibit the power of assignment.

In *Garden State,* a partnership had entered into a loan agreement with Midlantic Bank for the construction of a new hotel. *Garden State, supra,* 305 *N.J.Super.* at 513–14, 702 *A.2d* 1315. The parties entered into a modification agreement to extend the loan's maturity date, which provided: "No party hereto shall assign this Letter Agreement ... without the prior written consent of the other party hereto and any such assignment without such consent shall be void." *Id.* at 516, 702 *A.2d* 1315 (emphasis omitted). Midlantic subsequently assigned the loan to Starwood without obtaining the partnership's prior written consent. *Id.* at 517, 702 *A.2d* 1315. The partnership, however, acknowledged Starwood's rights under the loan agreement by making payments to Starwood, and eventually entering into a settlement agreement with it. *Id.* at 517–18, 702 *A.2d* 1315. Nevertheless, the partnership filed suit against Midlantic for damages arising from its breach of the modification agreement's non-assignment clause. *Id.* at 520, 702 *A.2d* 1315. The partnership argued that it was not required to challenge the assignment, but could recognize the assignment's validity while preserving its right to sue Midlantic

for breach of its covenant not to assign without the partnership's written consent.

To resolve the issue, the Appellate Division looked to Restatement section 322(2) as well as to out-of-state case law. *Id.* at 521, 702 *A.*2d 1315. The court adopted the following test as the standard for determining whether non-assignment language in a contract invalidates an assignment made in violation of the contractual provisions:

> [T]o reveal the intent necessary to preclude the power to assign, or cause an assignment violative of contractual provisions to be wholly void, such clause must contain express provisions that any assignment shall be void or invalid if not made in a certain specified way.
>
> [*Garden State, supra,* 305 *N.J.Super.* at 522, 702 *A.*2d 1315 (quoting *University Mews Associates v. Jeanmarie,* 122 *Misc.*2d 434, 471 *N.Y.S.2d* 457, 461 (Sup.Ct. 1983)) (internal quotations omitted).]

The Appellate Division held that, absent such express provisions, the assignment is valid, and that the obligor simply has the right to damages. *Ibid.*

In adopting the standard advocated by Restatement section 322, the Appellate Division joined other jurisdictions that follow the general rule that contractual provisions limiting or prohibiting assignments operate only to limit a party's *right* to assign the contract, but not their *power* to do so, unless the parties manifest an intent to the contrary with specificity. *Bel–Ray Co. v. Chemrite (Pty) Ltd.,* 181 *F.*3d 435, 442 (3d Cir.1999). To meet that standard, the non-assignment provision generally must state that non-conforming assignments (i) shall be "void" or "invalid," or (ii) that the assignee shall acquire no rights or the non-assigning party shall not recognize any such assignment. *Ibid.* In the absence of such language, the provision limiting or prohibiting assignments will be interpreted merely as a covenant not to assign. Breach of such a covenant may render the assigning party liable in damages to the non-assigning party, but the assignment, however, remains valid and enforceable against both the assignor and the assignee. *Ibid.*

In other jurisdictions, courts generally uphold non-assignment provisions of structured-settlement agreements when they include language stating that a plaintiff or payee shall not "have the power to sell, mortgage, encumber, or anticipate the Periodic Payments." *Liberty Life Assurance Co. v. Stone Street Capital, Inc.*, 93 *F.Supp.*2d 630, 637 (D.Md.2000); *Grieve v. General Am. Life Ins. Co.*, 58 *F.Supp.*2d 319, 321 (D.Vt.1999); *Henderson v. Roadway Express*, 308 *Ill.App.*3d 546, 242 *Ill.Dec.* 153, 720 *N.E.*2d 1108, 1109 (1999). *But see Cedar Point Apartments, Ltd. v. Cedar Point Inv. Corp.*, 693 *F.*2d 748 (8th Cir.1982) (construing non-assignment clause limiting "right to assign" agreement as not demonstrating intent to eliminate power to assign).

In another relevant section, the Restatement of Contracts recognizes the validity of assignments of contractual rights, but with three important exceptions:

(2) A contractual right can be assigned unless

(a) the substitution of a right of the assignee for the right of the assignor would materially change the duty of the obligor, or materially increase the burden or risk imposed on him by his contract, or materially impair his chance of obtaining return performance, or materially reduce its value to him, or

(b) the assignment is forbidden by statute or is otherwise inoperative on grounds of public policy, or

(c) assignment is validly precluded by contract.

[*Restatement (Second) of Contracts* § 317 (1981).]

Comment d to section 317 indicates that exception (a) involves a fact-sensitive inquiry in which "[w]hat is a material variation, an increase in burden or risk, or an impairment of the obligor's expectation of counter-performance ... depends on the nature of the contract and on the circumstances."

In *Grieve, supra*, 58 *F.Supp.*2d 319, the court found that all three exceptions to the general assignability of rights under a contract recognized by section 317(2) applied to a structured settlement. After setting out the tax treatment of structured settlements in sections 104(a) and 130 of the Internal Revenue Code, that court determined that an assignment might cause the company funding the structured settlement to lose its eligibility for favorable tax treatment. *Id.* at 323. The court also was

satisfied, however, that the assignment of settlement proceeds materially increased the risks to the company funding the structured settlement, which resulted in a material reduction of the value of the contract for that company. *Ibid.; see also Johnson v. First Colony Life Ins. Co.*, 26 *F.Supp.*2d 1227, 1229 n. 4 (C.D.Cal. 1998) (determining that defendant insurer included non-assignment clause in structured settlement to diminish uncertainty of tax risk associated with recipient's assignment).

Similarly, in *Liberty Life Assurance Co., supra,* 93 *F. Supp.*2d 630, the court applied the principles of Restatement section 317(2) in ruling that a non-assignment clause of a structured settlement agreement was enforceable. Defendants had submitted to the court a number of documents that disclosed the tax implications of structured settlements. The court considered whether the risks and burdens imposed on the company by assignment were material under section 317(2)(a):

> While the Court recognizes that the plaintiffs could never predict the tax implications of a structured settlement with absolute certainty, plaintiffs can certainly attempt to structure the terms of a contract to reduce the level of uncertainty to the fullest extent possible. That is clearly what plaintiffs intended to do in this case. Based on the nature and terms of the contract, the Court is satisfied that the plaintiffs drafted the contract with the purpose of ensuring that they received preferential tax treatment under § 130.
>
> [*Id.* at 636.]

The court then noted that by the "nature and terms of the contract," the settlement agreement specifically referred to sections 104(a)(2) and 130(c) of the Internal Revenue Code, and also observed that the inclusion of a non-assignment clause manifested the concerns of plaintiffs about the potential tax implications of an assignment by the recipient. *Ibid.* The court concluded that the non-assignment clause was a material part of the settlement agreement because it improved the plaintiffs' ability to predict their tax liability. *Ibid.* Accordingly, the court held that the recipient's assignment to a factoring company was void under the standards endorsed by Restatement section 317(2)(a) because the assignment materially increased the risk or burden imposed on

both the insurance company and the structured-settlement company. *Id.* at 636–37.

Addressing the same issue, the court in *J.G. Wentworth v. Capital Assignment Corp.*, No.1999–CA–002513 MR, 2000 WL 1682515, at *3 (Ky.App. Nov. 9, 2000), relied on *Liberty Life* to hold that a non-assignment clause applicable to guaranteed periodic structured settlement payments arising from a personal injury claim was enforceable because the assignment to a factoring company potentially could cause the company to lose its favorable tax treatment. *Ibid.* Adding another justification, the court reasoned that, "[h]owever, even if the [companies] received a favorable ruling from the Internal Revenue Service that they would not lose their tax benefit, the [companies] should not have to suffer the increased risk of litigating the issue." *Ibid.* The court determined that the non-assignment provision was enforceable because "[a]lthough it is unclear exactly what the tax implications of the proposed assignment will be, either an increased tax obligation or the added cost incurred from tax litigation would adversely affect the [company's] contractual right by 'materially reduc[ing] its value'" under section 317(2)(a). *Ibid.*

Tax treatment of structured settlements under the Internal Revenue Code is designed to encourage the use of structured settlements. In 1983, Congress enacted the Periodic Payment Settlement Act, Pub.L. 97–473, that amended the Internal Revenue Code to make clear that the periodic payment of personal-injury damages are excludable from a taxpayer's gross income. The amendments' legislative goals were to deter beneficiaries' premature dissipation of personal-injury recoveries by encouraging recovery through periodic payments, see Leo Andrada, Note, *Structured Settlements: The Assignability Problem,* 9 *S. Cal. Interdisciplinary L.J.* 465, 481 (2000), and to ensure that a plaintiff actually receives deferred funds when they are due. *Ibid.*

Two sections of the Code are designed to fulfill those goals. Focused on the plaintiff-beneficiary, section 104(a)(2) of the Code provides that gross income does not include personal-injury dam-

ages received either as lump sums or periodic payments. 26 *U.S.C.A.* § 104(a)(2) (1988 & Supp.2000). For the benefit of structured settlement companies, section 130 permits an entity to hold funds intended to be applied to the payment of deferred recoveries and invest them tax-free until they are paid to a plaintiff. Thus, section 130 allows an entity that undertakes, through a "qualified assignment," the responsibility for making periodic payments to exclude from its gross income the amount received for doing so, to the extent that the amount does not exceed the cost of the funding asset, usually an annuity contract. 26 *U.S.C.A.* § 130 (1988 & Supp.2000). An assignment is a "qualified assignment" only if it meets certain requirements.[2]

Based on those Code provisions, the typical personal-injury structured settlement operates in the following manner. The tortfeasor's insurance company assigns to another company, a structured-settlement company (typically a subsidiary of the insurance company), its liability to make the periodic payments to the plaintiff. In exchange for assuming its liability, the insurance company pays the structured-settlement company a lump sum that the insurance company immediately can deduct from its gross income. The structured settlement company then uses the lump sum to purchase an annuity to fund the periodic payments to the plaintiff. If the transaction meets the requirements of section 130, the structured-settlement company would not have to report the lump sum as income until it received the annuity payments, at which time it would be entitled to an offsetting deduction for periodic payments made to the plaintiff. And if the plaintiff meets the requirements of section 104(a)(2), he or she could exclude the

---

[2] Under section 130(c)(2)(A), the periodic payments must be "fixed and determinable" as to amount and time of payment. Under section 130(c)(2)(B), the periodic payments "cannot be accelerated, deferred, increased, or decreased by the recipient of such payments." Under section 130(c)(2)(D), the periodic payments must be "excludable from the gross income of the recipient" under section 140(a). Under section 104(a)(2), payments are excludable from gross income if the recipient receives the payments "on account of personal injuries or sickness."

periodic payments from his or her gross income, including only any portion of the periodic payment that represents interest income generated by the annuity.

### III

A preliminary issue before us is whether the application of Article 9 of the U.C.C. is controlling. The Appellate Division concluded that Article 9 did not prohibit the non-assignment provision of the structured-settlement agreement because the express exclusion of tort claims from Article 9 includes tort-settlement proceeds. *Owen, supra,* 330 *N.J.Super.* at 616, 750 *A.*2d 211. Specifically, the Appellate Division concluded that "Article 9's express exclusion of tort claims includes the proceeds of a tort claim, and therefore ... Article 9 does not prohibit the non-assignment provision of plaintiff's contract with defendant." *Ibid.* However, because we reach the same conclusion regarding the enforceability of the non-assignment clause irrespective of whether Article 9 applies to the proceeds of tort claims, and in view of the likely enactment of a statute specifically regulating assignments of structured settlements, we focus on whether the non-assignment provision is otherwise enforceable under New Jersey law and decline to decide whether tort-settlement proceeds are included in the express exclusion of tort claims of Article 9.

Owen argues that *Chelsea–Wheeler, supra,* 134 *N.J. Eq.* at 432, 35 *A.*2d 874, is inapplicable because it was decided on the basis of a public policy designed to safeguard trust funds from creditors, and asserts that that policy is not implicated by her tort settlement. Defendant, on the other hand, argues that because the non-assignment provisions of structured-settlement agreements also protect the obligee by ensuring a stream of payments to meet future needs, the application of *Chelsea–Wheeler* is appropriate for the reason that structured-settlement agreements resemble spendthrift trusts. In our view, the underlying purposes of tort claim structured-settlements clearly are distinguishable from those of spendthrift trusts. Accordingly, we elect to rely primari-

ly on the principles set forth in the Restatement of Contracts to resolve this appeal, rather than on the holding in *Chelsea–Wheeler*. In our view, the Restatement's analysis is better reasoned and more comprehensive.

■ Sections 322 and 317 are the relevant sections in the Restatement of Contracts dealing with assignments of contractual rights. Section 322 addresses the effect of contract terms that prohibit assignment of rights under a contract. Section 317 recognizes the validity of assignments, but specifically identifies important exceptions that limit the assignability of contractual rights. We are persuaded that the combined application of those two sections provides the best analytical framework to assess the validity of non-assignment provisions in a contract.

■ With regard to whether the non-assignment provision in Owen's structured-settlement agreement contains the explicit language necessary to void the assignment, we analyze the non-assignment provision under Restatement section 322, which embodies the general, now-majority rule that contractual provisions prohibiting or limiting assignments operate only to limit the parties' right to assign the contract, but not their power to assign, unless the parties manifest with specificity an intent to the contrary. In the absence of such a manifestation, a non-assignment provision is interpreted merely as a covenant not to assign, the breach of which renders the assigning party liable in damages. The assignment, however, remains valid and enforceable.

■ The non-assignment provision contained in Owen's structured settlement agreement stated: "To the extent provided by law, the aforesaid deferred lump sum payments shall not be subject to assignment, transfer, commutation, or encumbrance, except as provided herein." In our view, that language merely constitutes a covenant not to assign. It contains no specific prohibition on the power to make an assignment, and it does not specifically state that the assignments are "void," "invalid" or "that the assignee shall acquire no rights or the nonassigning

party shall not recognize any such assignment." *Bel–Ray, supra,* 181 *F.*3d at 442. Therefore, the non-assignment provision does not "reveal the intent necessary to preclude the power to assign, or cause an assignment violative of contractual provisions to be wholly void." *Garden State, supra,* 305 *N.J.Super.* at 522, 702 *A.*2d 1315 (internal quotations omitted). Thus, because the language does not specifically restrict Owen's power of assignment, the assignment is not void under section 322(2) of the Restatement.

With regard to section 317 of the Restatement, we address Continental's argument that the assignment of Owen's rights under the settlement agreement could cause it to face tax-reporting issues it allegedly bargained to avoid. We note that Owen's structured settlement agreement with Continental is not the typical personal-injury structured settlement in which a tortfeasor's insurance company assigns to a structured-settlement company its liability to make the periodic payments to the plaintiff. This record reveals that there is no structured-settlement company to which Continental paid a lump sum to purchase an annuity with the purpose of making periodic payments to Owen. As we understand the transaction, Continental itself undertook to make periodic payments to Owen. Because there is no structured-settlement company involved, section 130 of the Internal Revenue Code does not appear to entitle Continental to an offsetting deduction for periodic payments made to Owen.

Moreover, because Owen's structured settlement agreement was signed in 1983, the same year that Congress established the tax-incentive scheme favoring structured settlements, this settlement agreement apparently was not designed to take advantage of that favorable tax treatment. Accordingly, we reject Continental's contention that the assignment would cause it to lose tax benefits that it never anticipated receiving. As in *Grieve, supra,* 58 *F.Supp.*2d at 323, the assignment would not cause Continental to "lose its eligibility for favorable tax treatment."

With regard to the tax reporting requirements that Continental claims would materially burden its tax reporting responsibilities, we note that at oral argument Continental's attorney explained:

There is a tax issue. This is not a tax issue under section 130. This is a tax issue in terms of the burden of having to perhaps report information to the [Internal Revenue Service (IRS)] that Continental bargained not to have to do. And that would arise because if this assignment is permitted and if money is paid to the factoring company, there is a question of whether or not this is now payment on account of personal injury. If it is not then the reporting obligation may very well affect Continental.

. . .

[I]f Continental knows what the deal is between the factoring [company] and the individual, there very well may be the reporting obligation on Continental's part.

In attempting to explain the tax reporting burden, Continental's counsel stated that "if we know what the deal is, then we try to have to figure out the basis and what the payment is and report the differences [ ] to the IRS." When Continental's attorney was asked to explain how often Continental would have to report such differences to the IRS, he expressed the belief that only one report would be required. In our view, that one-time-per-payment reporting requirement does not "materially increase the burden or risk imposed" on Continental by the settlement agreement. See *Restatement (Second) of Contracts* § 317(2) (1981).

We also note that, unlike the parties to the settlement agreement in *Liberty Life Assurance Co., supra*, 93 *F.Supp.*2d at 636, Owen and Continental did not draft the settlement "with the purpose of ensuring that they received preferential tax treatment under § 130." Thus, because the assignment would not "materially increase the burden or risk imposed on [Continental]," *id.* at 637, we conclude that the assignment is not invalid under Restatement section 317(2)(a).

Accordingly, because the language in the non-assignment provision in Owen's structured settlement agreement does not specifically restrict Owen's power of assignment, and because the assignment would not "materially increase the burden or risk" imposed on Continental, we hold that in the context of this record Conti-

nental's non-assignment clause is unenforceable. We emphasize that because our holding is based on the record before us, it should not be understood to indicate that non-assignment provisions in structured settlement agreements generally are unenforceable.

We express our concern about the exceptionally high interest charge imposed by Metropolitan as compensation for its lump sum payment to Owen, and we anticipate that the Legislature will take cognizance of such interest charges in its statutory regulation of structured settlement assignments.

## IV

We acknowledge that the terms of the original assignment agreement between Owen and Metropolitan may not be possible to implement because of the time that has elapsed between the agreement and our determination that the assignment is enforceable. We reverse the judgment of the Appellate Division and remand the matter to the Law Division to resolve any open issues relating to the terms and scope of the assignment that are susceptible to resolution by the court.

*For reversal and remandment*—Chief Justice PORITZ and Justices STEIN, COLEMAN, LONG, VERNIERO, LaVECCHIA and ZAZZALI—7.

*Opposed*—none.