803 A.2d 172 (2002)
353 N.J. Super. 459
In re TRANSFER OF STRUCTURED SETTLEMENT RIGHTS BY Joseph W. SPINELLI, Petitioner.
Superior Court of New Jersey, Law Division, Mercer County.
Decided: January 25, 2002.
*173 Joseph W. Spinelli, Pro Se, Petitioner.
Michael L. Rosenberg and Arnold Braun, Sterns & Weinroth, Trenton, for Co-Petitioner, First Providian, LLC.
Alan P. Bruce, Law Offices of Edward H. Keiper, Pennsauken, for Travelers Property Casualty Company.
SABATINO, J.S.C.
This case of first impression concerns the new Structured Settlement Protection Act, N.J.S.A. 2A:16-63 et seq., a statute that became effective on August 2, 2001. Specifically, the court determines whether it is in the applicant's "best interest", a finding required by N.J.S.A. 2A:16-66(a), to approve the applicant's transfer of certain future payments due to him under a structured settlement in exchange for his present receipt of a sharply-discounted lump sum. In addition, the court also considers whether the terms of the agreement in force between the applicant and his structured settlement provider invalidate the proposed transfer.

I.
In November 1991, petitioner Joseph W. Spinelli was injured in a vehicular accident. The following year he brought a negligence action in the Superior Court, Ocean County, against two persons alleged to have caused his injuries. Through the efforts of Spinelli's then-attorney Norman *174 Hobbie, Esq., the negligence case settled in November 1995. The terms of the settlement called for Spinelli and his attorney to receive a lump sum of $240,000, plus four structured payments to Spinelli in the future, as follows:
1. $30,000 on May 12, 2000; 2. $50,000 on May 12, 2007; 3. $70,000 on May 12, 2013; and 4. $113,391 on May 12, 2019.
The four structured lump sums were to be paid to Spinelli by the Aetna Casualty and Surety Company ("Aetna").
It appears that Spinelli received the initial payment of $240,000, presumably net of litigation expenses and counsel fees, at the time of the November 1995 settlement. It also appears that Spinelli timely received in May 2000 the first $30,000 due under the Aetna structure.
In June of 2000, Spinelli was diagnosed with Hodgkin's Lymphoma. He was treated for that cancerous condition for several months. During the course of Spinelli's chemotherapy treatment he was unable to work. He exhausted his savings and was evicted from his apartment.
Spinelli alleges that his cancer treatment and other circumstances have caused him to accumulate substantial debts, including at least $9,000 owed in back rent and other various debts that he estimates to be in excess of $20,000.
Apparently Spinelli's cancer is now in remission. He hopes to get engaged and buy a home within the coming year. He presently has no dependents.
In March 2001, Spinelli began to investigate the possibility of transferring some of the remaining payments due under his structured settlement in exchange for an immediate lump sum. Spinelli engaged a New York City attorney, Lino DiCuollo, Esq., to assist him in exploring his options.
On August 20, 2001 Spinelli signed an Agreement with First Providian, L.L.C., ("First Providian"), a Florida limited liability company. First Providian is in the business of purchasing structured settlement rights from assignors in exchange for lump sum payments financed by institutional investors.
Subject to the approval of this court, First Providian has agreed to pay Spinelli a present lump sum of $30,000 in exchange for his assignment of (1) the $50,000 future payment due on May 12, 2007 and (2) the $70,000 future payment due on May 12, 2013. According to a Disclosure Statement from First Providian accompanying the transaction, these two future payments due to Spinelli under his structured settlement had a collective present value of $70,117.60 as of August 2001, using a 6.000% discount rate set forth in published Internal Revenue Service standards for valuing annuities. The Disclosure Statement emphasizes, however, that the quoted IRS discount rate is "not the rate used to calculate the purchase price" of the assignor's annuities, nor is it "the market rate for transfers of annuity payments or structured settlement payments." Id. at ¶ 3. Furthermore, the proposed transaction does not disturb Spinelli's right to the fourth structured installment of $113,391 due to him on May 12, 2019.
In October 2001, a Verified Petition was filed by First Providian seeking approval of the proposed transfer. The petition is supported by Spinelli, who appears before the court pro se, having discontinued his retention of counsel for reasons not disclosed to the court. The application is opposed by Travelers Property Casualty Company ("Travelers"), the successor in interest to Aetna as the result of corporate reorganization. Travelers contends that the proposed transfer violates certain anti-assignment language in the November *175 1995 structured settlement agreement between Aetna and Spinelli.
The court has considered the certification and live sworn testimony of Spinelli; the certification of Donald Wickham, manager of First Providian; the contractual documents; the briefs and other materials submitted in connection with this application; and the oral arguments of counsel.

II.
The Structured Settlement Protection Act was adopted by the New Jersey Legislature on July 2, 2001 as Public Law 2001, Chapter 139. As reflected in its stated purpose, the legislation "protects recipients of long-term structured settlements from aggressive marketing by factoring companies seeking to persuade these people to cash out future payments at sharp discounts." Sponsors' Statement to A-2146 (introduced February 28, 2000), at ¶ 1. The Act is similar to laws adopted in other states.[1]
The Legislature recognized that structured settlements are beneficial in providing tax-free compensation to victims of serious injury "in the form of a stream of payments, tailored to [their] future needs." Id. Accordingly, the Legislature sought to safeguard the beneficiaries of such structured instruments from over reaching practices. As the Legislature noted:
Structured settlements provide strong public policy benefits. They provide long-term protection for injury victims and their families. They provide against the loss or dissipation of lump sum recoveries. Factoring companies, commonly using phone banks, advertising and high-pressure sales to "buy" the settlement for a small lump-sum, undermine these benefits and may exploit an injured person at a time when they need cash. [Id. at ¶ 2. (emphasis added)]
To avoid such exploitation, the Legislature enacted in the new statute what are described as a series of "consumer protections." See Senate Commerce Committee Statement to Senate Committee Substitute for S-944 (June 15, 2000), at p. 2. Among other things, the Act requires a party purchasing the assignment of a structured settlement to provide the assignor with a detailed Disclosure Statement at least three days before the transaction documents are signed. See N.J.S.A. 2A:16-65. The Disclosure Statement must itemize all of the applicable payments and expenses. See N.J.S.A. 2A:16-65 (a),(b),(d),(e) and (f). It also must reveal the discounted present value of the structured benefits, using the applicable federal rate for calculating the discounted present value of annuities. N.J.S.A. 2A:16-65(c). Moreover, the assignor has the right to cancel the transfer agreement, without penalty or any further obligation, within three business days after signing it. N.J.S.A. 2A:16-65(h).
*176 The statute further imposes a paternalistic function. Specifically, the proposed transfer must be approved by a court or some other responsible administrative authority in order to be effective. In that regard, the statute calls for "express findings" by a judge or other fact-finder that:
a. the transfer is in the best interest of the payee, taking into account the welfare and support of the payee's dependents;
b. the payee has been advised in writing by the transferee to seek independent professional advice regarding the transfer and has either received the advice or knowingly waived the right to seek that advice in writing; and
c. the transfer does not contravene any applicable statute or the order of the court or other government authority.
[N.J.S.A. 2A:16-66 (eff. August 2, 2001)]
The statute does not define the "best interest" standard of Section 16-66(a). Nor have any regulations been enacted to clarify that term. There are no reported New Jersey cases applying the standard. This court therefore interprets and applies the standard without any direct guidance.
The "best interest" concept is not, of course, a stranger to the law. The term is commonly applied in family law settings, such as those involving the welfare of a child in custody matters, see Baures v. Lewis, 167 N.J. 91, 770 A.2d 214 (2001), the adoption of a child, see In re Adoption by W.P., 163 N.J. 158, 748 A.2d 515 (2000), or the education of a child, see Somerville Bd. of Educ. v. Manville Bd. of Educ., 167 N.J. 55, 768 A.2d 779 (2001). The best interest concept is also commonly applied in probate law, such as in trust matters, see In re Johnson Trust, 166 N.J. 340, 765 A.2d 746 (2001), or in guardianship proceedings, see N.J.S.A. 3B:11-27 (requiring services consistent with the best interests of the beneficiary). The term appears in a plethora of statutory provisions.[2] In essence, the term refers to optimizing the condition of the person, entity or public interest that the law is designed to protect.
The caselaw is sparse from other jurisdictions involving the application of the "best interest" standard to proposed transfers of structured settlement rights. Only a handful of decisions have addressed the issue, some permitting transfer and others concluding under the applicable facts that transfer was not in the applicant's best interests.
For instance, in Grieve v. General American Life Ins. Co., 58 F.Supp.2d 319, 324 (D.Vt.1999), a federal judge declined to approve such a transfer on terms that the court regarded as "exhorbitant." The plaintiff in Grieve had been rendered a paraplegic in a bicycle accident at the age of 17. She brought suit against the owner of the bicycle. The tort case eventually resolved with a structured settlement entitling the plaintiff to $1,021 monthly for the rest of her life, plus nine lump-sum payments every three years of $2,500 to $15,000. Over time plaintiff had chronic *177 medical complications and incurred substantial debts. While in such financial distress, plaintiff entered into a contract with Singer Asset Financial Company to assign 120 of her future monthly payments of $750 and an additional $13,000 in future lump sum payments under her structured settlement, all worth some $103,000, for the present receipt of $41,800.
In rejecting the proposed assignment in Grieve, the district court observed:
Plaintiff is currently in substantial financial need. The Court is asked to enforce a transaction which will place her in significantly greater financial need, by cutting her income stream in half for the next fifteen years. Grieve, like any other citizen, is free to make agreements which this Court might deem unwise. But this Court will not lend its approval to the voiding of unambiguous, bargained-for contract terms in order to enable Singer to profit, at an exorbitant rate of interest, from Grieve's financial distress.
Grieve, 58 F.Supp.2d at 324. (emphasis added).
Likewise, applying the "best interest" requirement of the pertinent Connecticut statute,[3] a trial judge in that state rejected the proposed assignment of structured settlement rights. See Cavallaro v. SAFECO Assigned Benefits Co., 1999 WL 1126320 (Conn.Super.) (Nov. 18, 1999) (Skolnick, J.). In Cavallaro, the payee sought to assign his rights to 48 future monthly payments of $701.80 for a lump sum of $22,577.00. The payee, who was then unemployed and on social security benefits, wanted the lump sum in order to buy a condominium. Although the trial court recognized that the payee's desire to buy a home was "likely in his best interests," it nevertheless rejected the transaction. It found that the payee had "not shown a reason for the assignment that comport[ed] with the purpose of the statute, which is to provide emergency assistance to those payees of a structured settlement agreement that are in immediate financial need." Id. at 9. The court also noted that the transfer might have caused potential adverse tax consequences for the provider of the structured settlement. Id. at 9.
On the other hand, proposed transfers were approved by other Connecticut trial court judges in Rumbin v. Utica Mutual Ins. Co., 1999 WL 130333 (Conn.Super.) (March 2, 1999) (Flynn,J.) and Buchanan v. American Mutual Life Ins. Co., 1999 WL 1081346 (Conn.Super.) (Nov. 15, 1999) (Hurley, J.).
Rumbin concerned a structured settlement agreement under which the plaintiff was to have received 30 semi-annual payments beginning in 1999 and a final lump sum payment in 2014. Seven months after agreeing to the structure, plaintiff sought to transfer his rights to some of the payments in exchange for an immediate lump sum of $ 13,000. He stated that he needed the lump sum payment in order to keep his home from being foreclosed upon and to deal with an unanticipated loss of income. The court found that, with the pending threat of foreclosure on plaintiff's home, the transfer was in the best interests of the plaintiff while also providing some incentive to the purchaser to create a market and engage in such a transaction. Rumbin, 1999 WL 130333 (Conn.Super.) at 4. In reaching that determination, the court observed that "[a]s time marches on and the shadows lengthen, we may have to muster assets in a way not first contemplated *178 to keep a roof overhead and a mortgagee at bay. The state has a compelling interest in securing the freedom to do so." Id.
In Buchanan, the plaintiff wished to transfer one of six remaining payments that were due to him under a structured settlement of an automobile accident case. The proposal concerned the transfer of a single installment of $55,000 due to Buchanan in 2002 for a present lump sum payment of $31,000 in 1999. Buchanan, a divorced father earning only $28,000 per year, needed the immediate funds to pay off some $20,000 in debts, including child support, medical bills, housing expenses, and student loans. He was being hounded by bill collectors and was unable to borrow money from banks or other sources. The court was "firmly convinced" that the transfer was in Buchanan's best interests in getting out of debt. Buchanan, 1999 WL 1081346 (Conn.Super.) at 2. Its endorsement of the transaction was buttressed by the fact that Buchanan would still be receiving the other five sizeable installments due to him under the structured settlement between 2007 and 2027. Id.[4]
The facts here are most analogous to those of Buchanan. According to his sworn testimony, petitioner Spinelli, like Buchanan, is some twenty thousand dollars in debt. His bout with cancer has caused him a serious financial setback. He wishes to pay off his bills and get a fresh start. He hopes to buy a home and get married. As the Connecticut court said of Buchanan, Spinelli "needs the money now." Id. Moreover, Spinelli, like Buchanan, is not liquidating his entire future income stream. If the proposed transfer is approved, Spinelli will still receive his final structured installment of $113,391 in the year 2019.
Given Spinelli's financial troubles, the court is satisfied that a present transfer of his rights to the 2007 and 2013 structured installments is in his best interest under N.J.S.A. 2A:16-66(a). In that regard, the court notes that Spinelli has no dependents whose own welfare would need to be considered under the statute.
A more difficult question is whether the specific terms offered by First Providian are in Spinelli's best interests. First Providian has offered to pay Spinelli a lump sum of $30,000 in exchange for his future rights to $120,000, specifically $50,000 to be received in 2007 and $70,000 in 2013. As noted above, under federal discount rates, those future payments had a present value of $70,117.60 in August 2001.
On the surface, it would appear that First Providian is extracting a gain of over $40,000 on the deal. The court recognizes, however, that the quoted federal discount rate on the First Providian application form is only presented for a rough comparison. According to the sworn certification of First Providian's manager Donald Wickham, the firm's own "cost of funds" is set by yield rates demanded by its institutional investors. Wickham attests that First Providian's cost of funds rate is 14.5%, or an effective annual rate of 15.504 percent. By comparison, First Providian has discounted Spinelli's future payments by a nominal annual rate of 16.635 percent, or an effective annual rate of 17.964 percent. Wickham claims that, after taking into account its costs of funds, legal fees and other transaction costs, First Providian is only making a profit of $1,833.52 on the transaction.
*179 Whatever the actual profit margin may be for First Providian, the reality for Mr. Spinelli is that he is giving up his right to future money at a sharp discount of 17 to 18% per year. That steep rate of diminution is troubling to the court, especially in today's economic times when, for instance, residential mortgage loans are at decade low interest rates in the single digits. Moreover, the risk factors for First Providian (or for its institutional investors) in the transaction would appear to be limited. The structured settlement payments are not contingent on Mr. Spinelli's life or health. The payments are to be made by the Travelers, a major financial institution that has been in business for decades. Nevertheless, the court is mindful of the uncertainties of our global economy in general, and in particular of the fragility of the insurance market in the wake of the September 2001 terrorist attacks and the current recession.
Despite these reservations about First Providian's quoted rates,[5] the court is persuaded that the transaction should go forward for several reasons.
First, the court takes into account the unique circumstances of the payee himself. Mr. Spinelli is a fully licensed financial adviser who majored in business in his undergraduate education. He formerly worked on Wall Street with the Morgan Stanley and Paine Webber investment firms and has experience as a mortgage broker. He strikes the court as a person with sophistication in financial transactions. He has reviewed the proposed transaction with his associates in the financial world, including a senior vice president of investment at Paine Webber. He also has had the advice of a Park Avenue attorney, who notarized the application forms.
Second, the proposed transaction is apparently at competitive rates. Spinelli testified that he shopped around for price quotes on the Internet and through other sources before choosing the First Providian proposal. First Providian also has supplied the court with a copy of a quote from a competitor, Clockwork Funding LLC, which would have paid Spinelli a comparable sum of $30,500.00 for the proposed transfer.
Third, the court has given Spinelli every opportunity to reflect on the transaction. The original return date of this application was adjourned for weeks, and Spinelli has appeared before the court on two occasions to reaffirm his desire to go forward with the transfer. He has testified in court under oath and also has submitted a written certification explaining why it is so important to him that the transfer be approved.
On the whole, the court is satisfied that the transaction is in Spinelli's best interest in accordance with N.J.S.A. 2A:16-66(a). In making that finding on these facts, the court by no means holds that the same conclusion would be reached for payees lacking Spinelli's financial acumen. Nor does the court endorse the discount rate of this transaction for future cases; it merely notes that the rate appears to be competitive under the present facts. As a condition of approval, however, the court has *180 required that First Providian adjust the lump-sum payment to be made to Spinelli, in recognition of the passage of over five months from his signing the contract documents in August 2001 to the time of this court's bench ruling in January 2002 approving the transfer.[6]
The court also finds that subsection (b) of the statute has been met. The record clearly reflects that Spinelli was advised in writing by First Providian to "seek independent professional advice regarding the transfer." By his own account, Spinelli has received advice on the transfer by a lawyer and some former Wall Street associates, and has knowingly waived the right to have their continuing advice in the court process.
In addition, the court finds under subsection (c) of the statute that the transfer does not contravene any applicable statute or the order of a court or other government authority. In particular, the court has not found the usury statutes applicable to the proposed transfer, it not being in the nature of a loan. Cf. N.J.S.A. 5:9-13(d)(11)(wherein the Legislature expressly made compliance with the usury rates a condition of court approval of the assignment of future payments of state lottery winnings). Further, unlike the structured settlement transfer laws of some other states,[7] the New Jersey statute does not cap the interest rate applicable to such transfers.

III.
As a final matter, the court turns to an objection to the transaction lodged by Travelers, the current payor of the structured settlement. Travelers argues that the proposed assignment is in violation of the terms of the November 1995 agreement between Spinelli and the original payor, Aetna Casualty and Surety Company. Paragraph 3 of that agreement recites:
Payee's Rights to Payments: Plaintiff [Spinelli] acknowledges that the Periodic Payments cannot be accelerated, deferred, increased or decreased by the Plaintiff or any Payee; nor shall the Plaintiff or any Payee have the power to sell, mortgage, encumber, or anticipate the Periodic Payments, or any part thereof, by assignment or otherwise. [emphasis added]
A similar argument of non-assignability was recently considered by our Supreme Court in Owen v. CNA Insurance, 167 N.J. 450, 771 A.2d 1208 (2001). In Owen the Court reviewed language in a structured settlement agreement that likewise purported to prevent assignments by the payee. Writing for the Court, Justice Stein observed that:
[C]ontractual provisions prohibiting or limiting assignment operate only to limit the parties' right to assign the contract but not their power to assign, unless the parties manifest with specificity an intent to the contrary. In the absence of such a manifestation, a non-assignment provision is interpreted as a covenant not to assign, the breach of which renders the assigning party liable in damages. The assignment, however, remains *181 valid and enforceable. [Owen, 167 N.J. at 467, 771 A.2d 1208.]
Applying those principles to the structured settlement agreement in Owen, the Court held that the agreement was merely a covenant by the payee not to assign his rights in the structure to a third party. The Court found it significant that the agreement "[did] not specifically state that the assignments are `void', `invalid', or `that the assignee shall acquire no rights or the nonassigning party shall not recognize such assignment.'" Id., quoting Bel-Ray Co. v. Chemrite, 181 F.3d 435, 442 (3d Cir.1999).
Here, the November 1995 agreement between Spinelli and Aetna does specifically provide that Spinelli would have no "power" to sell his rights to the future structured payments "by assignment or otherwise." However, the agreement is bereft of any language stating that such an assignment would be "void" or "invalid." Absent such a clear expression of invalidity, this court concludes, under the rationale of Owen, that the November 1995 agreement does not nullify First Providian's purchase of Spinelli's rights to future payments. However, Spinelli may well be exposed to monetary damages to Aetna's successor Travelers, for breach of his covenant of non-assignment, should Travelers suffer any harm as a consequence of Spinelli's transfer.[8]

IV.
For all of the above reasons, the proposed transfer to First Providian, LLC, of Joseph Spinelli's structured settlement benefits due in May 2007 and in May 2013 is hereby approved, for the modified lump sum amount of $31,655.46. As noted, this approval is subject to any recourse in contractual damages that Travelers may have against Spinelli for breaching his covenant of non-assignment set forth in the November 1995 structured settlement agreement.
SO ORDERED.
NOTES
[1] See, e.g., Cal. Ins.Code § 10137(a)(voiding transfers of structured settlement payment rights unless the transfer is "fair and reasonable and in the best interest of the payee"); 10 Del.Code Ann. § 6601(3)(prohibiting structured settlement transfers unless a court finds transfer is "fair and reasonable and in the best interests of the payee and the payee's dependents"); Fla Stat. Ann. § 626.99296(3)(a)(7)(requiring courts to determine that the net amount payable to the transferor of a structured settlement is "fair, just and reasonable under the circumstances then existing"). The court's research located similar statutes in force in Connecticut, Georgia, Idaho, Indiana, Iowa, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Nebraska, North Carolina, Oregon, Pennsylvania, Rhode Island, South Dakota, Tennessee, Virginia, Washington, and West Virginia.
[2] The court's research uncovered more than 300 statutory provisions in New Jersey that include a "best interest" standard. As a sampling, see, e.g., N.J.S.A. 2A:4A-36 (regarding juveniles); N.J.S.A. 2A:22-2 (adoptions); N.J.S.A. 2A:34-23.2(b) (visitation); N.J.S.A. 2A:34-31 (jurisdiction in child removal matters); N.J.S.A. 2A:67-29 (commitments); N.J.S.A. 2C:25-29 (domestic violence); N.J.S.A. 3B:10-23 (probated estates); N.J.S.A. 4:22-50.2 (animal shelter receivers); N.J.S.A. 5:5-63.2 (horseracing); N.J.S.A. 9:2-3 (custody); N.J.S.A. 14A:2-7 (corporations); N.J.S.A. 17B:32-47 (insolvent insurers); N.J.S.A. 18A:47-4(schools); N.J.S.A. 27:23-23.4 (environmental impacts); N.J.S.A. 30:4C-12.1 (parental rights terminations); and N.J.S.A. 52:27B-61 (public bidding).
[3] Conn. Gen.Stat. § 52-225f(c)(proposed transfer of structured settlement rights must be "in the best interests of the payee and... fair and reasonable under all the circumstances then existing").
[4] Buchanan was to receive another $75,000 in the year 2007, $100,000 in 2012, $125,000 in 2017, $150,000 in 2022 and $250,000 in 2027. Id. at 1.
[5] Our State Supreme Court has expressed similar reservations about "exceptionally high interest rate charge[s] imposed" by a factoring company in calculating a lump sum payment for a payee's structured settlement rights. See Owen v. CNA Insurance, 167 N.J. 450, 470, 771 A.2d 1208 (2001). Rather than imposing constraints on those rates by judicial fiat, the Court left it to the Legislature "to take cognizance of such interest charges in its statutory regulation" of such transfers. Id. However, when the Legislature enacted the Structured Settlement Protection Act three months after the Owen decision, it failed to impose any ceilings on the allowable interest rates, instead adopting a more amorphous "best interest of the payee" standard.
[6] Subsequent to oral argument and pursuant to the court's conditional directive, First Providian recalculated the lump-sum payment to Spinelli from $30,000.00 to $31,655.46, effectively yielding Spinelli in January 2002 the value that he had agreed to in August 2001.
[7] See, e.g., N.C. Gen.Stat. § 1-543.12(6)(providing that the discount rate used in a structured settlement transfer "does not exceed an annual percentage rate of prime plus five percentage points calculated as if the net amount payable to the payee... was the principal of a consumer loan").
[8] In this regard, the court notes that at oral argument in these proceedings, counsel for Travelers was unable to state with certainty whether Travelers or Aetna would suffer any adverse tax consequences if Spinelli's transfer of his payments were effectuated. Short of such a tax ramification, this court is hard pressed to imagine how the payor of a structured settlement would be injured by changing the identity of the party receiving the payments. It also is somewhat ironic for Travelers, having stepped into the shoes of Aetna as payor of the structure, to complain about First Providian stepping into Spinelli's shoes as a payee.