OPINION OF THE COURT
Andrew V. Siracuse, J.
Six months ago, in Matter of Emerald Funding (Sup Ct, Monroe County), this court had the opportunity to discuss Gen *464 eral Obligations Law § 5-1701 et seq., the so-called Structured Settlement Protection Act (SSPA). At that time the court addressed a provision in an annuity agreement that deprived the payee of both right and power to alienate any part of the proceeds. The specific requirements of the SSPA were therefore not at issue.
The present case, however, arises from a proposed transfer of a sum payable under an agreement in which only the right and not the power to alienate is barred. The court presumes that this is the reason that Travelers Life & Annuity Co. has not contested the transfer, as it did in the Emerald case.
Instead, the only party that has appeared before the court is the proposed buyer of the annuity payment. The seller, Jason DeMallie, has signed an affidavit which accompanies the petitioner’s papers. He did not appear personally before the court, and the court has only fragmentary information about his resources, living situation, health and financial needs. The court must make its decision based on the papers alone.
The standard for approval is set out in General Obligations Law § 5-1706. A number of disclosures must be made and certain documentation must be provided. The payee must be advised in writing to seek independent professional advice. Interested parties must be served, and the court must then determine if the proposed transaction is “in the best interest of the payee . . . and whether the transaction, including the discount rate used to determine the gross advance amount and the fees and expenses used to determine the net advance amount, are [sic] fair and reasonable” (General Obligations Law § 5-1706 [b]). It is assumed, therefore, that the payee’s decision, even if freely entered into, is not always one a reasonable person might make, and the court is in effect asked to protect an individual from himself or herself.
The SSPA is a recent statute — it was effective July 1, 2002— and the court has found only three reported cases that have construed the standard that the court must apply. Two of them are from the Supreme Court, Rensselaer County: Matter of Settlement Capital Corp. (194 Misc 2d 711 [2003]) and Matter of Settlement Funding of N.Y. (195 Misc 2d 721 [2003] [hereafter referred to as Cunningham]). The third, which contains a thorough and useful review of the case law from both New York and sister states, is Matter of Settlement Capital Corp. (Ballos) (1 Misc 3d 446 [2003] [hereafter referred to as Ballos]), from Supreme Court, Queens County.
*465 As the Bollos case points out, the court is required to conduct two distinct inquiries before a transfer of a structured settlement can be approved. The fairness and reasonableness of the transaction is to be weighed from the perspective of the overall market in loans, taking into account prevailing interest rates and the possibilities of alternative financing. The best interest standard, in contrast, considers the financial condition and needs of the specific payee who is proposing to sell his or her income stream.
These two questions cannot always be separated. The more pressing the need, the more reasonable it may be for a payee to obtain immediate cash at a steep discount rate. As the old proverb has it, one seeks any port in a storm. It is thus both useful and illuminating to address both questions, though in most of the cases of which this court has notice the second inquiry is the one to which most attention is paid.
That is no doubt because the discount applied by prospective buyers of these rights is roughly the same in every case. And in every case the rate translates into a punishingly high effective rate of interest. In this case Mr. DeMallie seeks to sell a scheduled payment of $100,000, due in 2006. According to the petitioner’s papers, the current present value of the $100,000 is $91,678.66. Mr. DeMallie is to receive $63,000, which translates to an effective interest rate of more than 18% per year. (In the Bollos and Cunningham cases the interest rate was lower, but the petitioners received substantial fees out of the gross amount. Here the petitioner charges no fees over and above the $28,678.66 discount.)
This is clearly a very high rate for a secured investment. The petitioner attempts to justify it through an affidavit from a senior vice-president, David Reape, who compares it with credit card charges from several banks. Credit cards, however, are unsecured. Even the minimal security provided by a motor vehicle — a depreciating asset subject to accidental damage which must be located and repossessed, often with judicial assistance — is sufficient to make car loans much less costly than credit card debt. The petitioner is buying an obligation to pay a given sum on a given date, entered into by a company previously determined to be adequately capitalized and competently managed. This is as secure as any commercial instrument can possibly be, and there is no obvious justification for treating it as equivalent to a consumer’s unsecured promise to keep a revolving credit account current.
*466 Mr. Reape’s affidavit also claims that it is expensive for the petitioner to do business because of “the size and timing of payments, internal cost of funds, servicing expenses, the cost of locating potential clients, and the expenses associated with obtaining court orders.” Moreover, it is difficult for his company to sell assets on the secondary market, in order to free up capital for future transactions, because only “a handful of companies [are] currently purchasing these rights.” But the reasonableness of the proposed sale cannot be established by proof that the petitioner is undercapitalized and incapable of sustaining its operations without selling its receivables to a third party. And if the cost of doing business is so high that a secured investment must be treated as an unsecured one — so that Mr. DeMallie would be better advised to make minimum payments on a 12.99% credit card until he can pay off the entire balance in three years’ time — the court must conclude that this business is one in which the terms simply cannot be “fair and reasonable.” Surely the Legislature did not mean to equate fairness with “whatever the market will bear.”
It may be that a maturing secondary market and an increasing acceptance of the sale of structured settlements will bring down the rate charged by firms like the petitioner’s. Articles cited in the Bollos case suggest such a trend. That, however, is a speculative matter. As things stand it is hard for the court to conclude that the proposed transaction is either fair or reasonable.
It is less difficult to decide if it is in Mr. DeMallie’s best interest, in part because the petitioner has supplied so little on this question. Mr. DeMallie states in an affidavit that he wants to “take advantage of currently low mortgage rates.” The absurdity of borrowing money at close-to-usurious rates in order to secure an investment at one or two percentage points below historic levels is obvious and should not be belabored. If Mr. DeMallie can qualify for a mortgage he can obtain one with a short term or with a balloon payment scheduled for some time after the $100,000 payment is due in 2006. Although he cannot use this sum as collateral, it’s certain availability is something most loan officers would consider.
Nor is there sufficient clarification of Mr. DeMallie’s financial situation to explain or support his choice. The burden is on the petitioner to satisfy the court that the transaction is appropriate, and the court surely would require more than the representations by counsel for petitioner that Mr. DeMallie lives with a *467 grandmother who is about to sell her house, and that he wishes to buy it. Any number of scenarios might be spun out from these few facts.
What specific standard should be applied is difficult to state. Although the sponsors of the legislation spoke of “limiting transfers of structured settlement payments to true hardship cases” (NY Assembly Mem in Support of L 2002, ch 357, 2002 McKinney’s Session Laws of NY, at 2036), no such language appears in the law as enacted. Nonetheless, those courts who have considered that statute have adopted an interpretation close to that found in the sponsors’ statement. Thus, the court in Cunningham barred a transaction in which the payee seems to have wanted to invest in or start a business (195 Misc 2d 721, 725 [2003]; it is hard to tell the exact reason from the decision). It noted, though, that it had approved a sale in an earlier, unreported case in which “the payee desperately needed cash to obtain life sustaining medical treatment for a loved one and had no other legitimate means of raising the money.” (Id. at 725.)
The Cunningham court noted that “it will generally be unnecessary to consider the payee’s ‘best interest’ after concluding that a transaction is not ‘fair and reasonable.’ ” (Id. at 725.) The court in Bollos, on the other hand, chose to treat the best interest question first, relegating its consideration of the fairness standard to dicta. Its conclusion, after discussing both Cunningham and a number of cases from other states, was that there must be
“a case-by-case analysis to determine whether the proposed transfer of structured settlement payments, which were designed to preserve the injured person’s long-term financial security, will provide needed financial rescue without jeopardizing or irreparably impairing the financial security afforded to the payee and his or her dependents by the periodic payments.” (1 Misc 3d at 455.)
This is a difficult standard to parse. In most cases where the payee is capable of supporting himself or herself it could be said that the sale of future payments will not jeopardize financial security; the majority of people achieve some version of security without the aid of large periodic payments. The genuinely limiting term here is “rescue,” but what constitutes rescue, and from what danger?
The payment structure in all of these cases was determined by either judicial process, subject to articles 50-a and 50-b of the *468 CPLR, or by negotiations in which the payee’s interests were represented. As such, it was presumed to be the best compensation for the payee’s injuries at the time of the verdict or settlement. To overcome this presumptive validity, the court rules that there must be a showing, by clear and convincing evidence, of an unforeseeable change in circumstances that would justify the sale of rights to future payments. While such a standard cannot be described with absolute precision, it should resemble the one employed by courts in applications to modify child support on the basis of changed circumstances.
Unless an appellate court establishes a different rule, this is the standard the court intends to apply to this and all future applications. It is easily applied to the facts presented here. As there is nothing unforeseeable in the need for housing, nor any showing that Mr. DeMallie has become otherwise incapable of self-support, this petition should be dismissed; an unforeseen opportunity is not a change in circumstances. As no party appeared in opposition, this decision may be filed as an order to close the case, with copies of the papers submitted by petitioner.