McCann, John S., J.
INTRODUCTION
This is a civil action pursuant to G.L.c. 231C, §2, (the “Transfer Act”) in which transferee Seneca One, LLC[1] (“Seneca”), and payee Heath LeBlanc (“LeBlanc”) have petitioned the Court to authorize and approve a transfer of certain structured settlement rights from LeBlanc to Seneca equaling $59,730.00. In exchange for transferring these future payments to Seneca, LeBlanc would receive a single lump-sum cash payment of $9,478.67. Under the Transfer Act, the Court must approve of any transfer of structured settlement rights. After a hearing on November 17, 2006 (the “hearing”), the petition was taken under advisement. For the following reasons, the petition to authorize and approve the transfer of future structured settlement rights from LeBlanc to Seneca is DENIED.
BACKGROUND
The essential facts are not in dispute. LeBlanc is a twenty-two (22) year old male with no dependents. While a minor age two (2), LeBlanc and his mother, Jeanette LeBlanc, brought a civil action seeking damages against Joseph Marderosian (“Marderosian”), their landlord and others, for exposure to lead and lead-based paints.[2] By a Release and Settlement Agreement (the “Settlement”) dated April 23, 1991, Marderosian settled the lead exposure claims in consideration for the sum of $250,000. The Settlement was amended on June 27, 1991, to provide for the payment of attorneys fees, and to authorize certain guaranteed future periodic and lump-sum payments to LeBlanc under an annuity policy issued on July 1, 1991, by Prudential Insurance Company of America (the “Annuity Issuer”). Pursuant to the Settlement Prudential Property and Casualty Insurance Company (the “Obligor”), became obligated to make periodic payments to LeBlanc. Subsequently, the Obligor purchased an annuity from the Annuity Issuer naming LeBlanc as the annuitant.
The benefits to be paid to LeBlanc pursuant to the Settlement were as follows:
1. One (1) guaranteed payment of $20,000 to be paid on October 29, 2002;[3]
2. One hundred and twenty (120) monthly payments of $823.00 each, guaranteed for ten (10) years, commencing on or about October 29, 2002, through and including September 29, 2012;[4] and
3. Ten (10) annual payments of $9,955.00, guaranteed for ten (10) years, commencing on or about October 29, 2012, through and including October 29, 2021 (the “Periodic Payments”).
In the present case LeBlanc responded to a mail solicitation from Seneca that offered lump-sum cash payments to holders of structured settlements. After a phone conversation with a Seneca employee named John Towner, LeBlanc agreed to transfer to Seneca certain rights to receive future structured settlement payments in exchange for a lump-sum cash payment. Subsequently, on September 22, 2006, LeBlanc entered into a Transfer and Assignment Agreement (the “Transfer Agreement”) with Seneca. Subsequently, on October 10, 2006, Seneca filed an Application to Authorize Transfer of Structured Settlement Payment Rights with the Court. On October 23, 2006, a Notice of Hearing was filed by Seneca, notifying the Annuity Issuer and the Obligor. The motion was unopposed.[5] Seneca was represented at the hearing by counsel.[6]
The Transfer Agreement seeks to transfer from LeBlanc to Seneca, six (6) annual payments of $9,955.00 each, due to him on October 29, 2016, through and including, October 29, 2021 (the “Transferred Payments”). In exchange for the Transferred Payments, LeBlanc is to receive a single lump-sum payment of $9,478.67 from Seneca. Thus, LeBlanc is effectively giving up future payments of $59,730.00 in order to receive a current cash payment of $9,478.67.
The Disclosure Statement presented by Seneca, and signed by LeBlanc, reveals the following relevant information:
*112 1. The discounted present value of the Transferred Payments is $28,241.25, using the applicable federal interest rate of 6.00%;
2. The net amount to be received by LeBlanc from Seneca in exchange for the Transferred Payments represents 38.802% of the estimated current value of the payments; and
3. Based on the net amount that LeBlanc will receive from Seneca, and the amounts and timing of the Transferred Payments, LeBlanc will, in effect, be paying interest to Seneca at a rate of 16.021%.[7]
The Disclosure Statement advised LeBlanc to seek independent professional advice from an attorney, certified public accountant, actuary, or other licensed adviser regarding the transfer, but LeBlanc waived his right to do so, and appeared without counsel. Seneca’s counsel stated that he had met with LeBlanc five minutes before the hearing. Seneca reported that it had provided LeBlanc with the Disclosure Statement prior to the hearing, and had identified for him all payments, costs, fees, and the applicable factoring, interest and discount rates.
On September 16, 2006, LeBlanc executed an affidavit declaring that he had understood and approved of the Transfer Agreement. In the affidavit, LeBlanc stated that he believed that the Transfer Agreement was in his best interests, and that he wished to sell the Transferred Payments so that he could purchase a reliable used vehicle. He also averred that the original structured settlement was intended to compensate him for personal injuries and future medical expenses, and that he no longer had any recurring medical problems that would incur future medical expenses.
At the hearing, upon inquiry of counsel for Seneca, LeBlanc further testified that he needed the cash now because; (1) he did not have a place to live; (2) he needed to buy furniture; (3) his car’s transmission was deteriorating and he needed transportation; and (4) he wanted to go back to school. Generally LeBlanc stated that he was “in a bad situation.” He also revealed that he had previously transferred part of his structured settlement with another company, and was thus familiar with the process involved. LeBlanc stated that he had explored other ways to obtain the money that he needed, but that he did not have sufficient credit to get a loan, and that there were no family members that could assist him financially.
Upon inquiry of the Court, LeBlanc testified that he had previously sold approximately $40,000 of his structured settlement to another financial company for approximately $10,000 when he was “either eighteen or nineteen.” He testified that he had spent this money on a couple of months of rent payments, and a 1986 Mercedes that was now “dying.” He averred that in 2002 he had also received a single payment of $20,000 as part of the Settlement, and that he had spent that money on another car and school fees. He had purchased a 1994 Sentra which had been totaled by his roommates in a car accident. He stated that although the car was insured he did not receive any money from the insurance company because “we didn’t have any proof of anybody destroying it.” LeB-lanc was currently living with his mother in Worcester, but was not able “to be there too long ‘cause she’s on housing and they only give her a week or two for me to stay there.” Previously they had been living with LeBlanc’s sister until she kicked them out.
Although LeBlanc stated that his father was not in his life, he had spoken to his mother a month before the hearing about selling more of his structured settlement, and that she had told him that she did not object because of the situation that he was in. When asked by the Court why he had not sought the advice of counsel, LeBlanc stated, “I just think I ought to do this myself, I guess. I don’t know.” LeBlanc stated that he understood that factoring in the previous transaction with the proposed Transfer Agreement before the Court, he would have sold approximately $90,000 worth of his structured settlement for approximately $20,000.
When the Court inquired about his initial communications with Seneca, LeBlanc did not appear to understand what a structured settlement was or what was involved in the exchange with Seneca:
Court: Do you recall what it said?
LeBlanc: It just said get cash, get aid, or basically just telling me — asking me if I want my money.
Court: And did they refer to a structured settlement?
LeBlauc: Can you — I don’t know what that means, I’m sorry.
Court: Well, you have an agreement here about your other case, it’s what they call a structured settlement—
LeBlanc: Okay—
Court: . . . Did the notice that you got from Seneca refer to a structured settlement?
LeBlanc: No, it hasn’t.
Court: What did they say you can get cash for? What was the exchange? What were they saying they’d give you cash for?
LeBlanc: I don't really recall I’m trying to think of what it says but—
LeBlanc stated that he would receive monthly income pursuant to the Settlement until 2012. According to LeBlanc these monthly payments had been reduced from $1013.00[8] per month to $523.00 per month when he sold a portion of his structured settlement in the previous transfer. When asked by the Court what would happen if he ran into further financial difficulties in the future, and whether he would compromise the structured settlement again, LeBlanc stated, “I’m not going to say yes, but if I had to I might; I might.”
*113 Although he is currently employed to unload trucks by United Parcel Service for approximately eighteen (18) to nineteen (19) hours per week, LeBlanc stated that his goal was to go to school so that he could become a car mechanic. LeBlanc testified that he had graduated from high school and that he went on to attend Quinsigamond Communily College for a semester. He told the Court that he had applied for student loans but that he had never gone to a bank and pledged some of his structured settlement against a bank loan. Although LeBlanc testified that he needed money to attend school part-time commencing with the spring semester at Quinsigamond College, he had not yet checked how much tuition would cost, and had not yet sent in an application. He further stated that he hoped to take two to three classes per week that would teach him to be an auto mechanic. Upon graduating from Quinsigamond College, which is a two-year college, he hoped to transfer to Worcester or Holy Cross and take business courses.
DISCUSSION
1. The Purpose of Structured Settlement Protection Acts
The use of structured settlements has expanded greatly in the past 25 years. See Ulman, Craig & Hindert, Daniel, Transfers of Structured Settlement Payment Rights, 44 No. 2 Judges’ J. 19, 19 (2005). More controversial has been the concurrent expansion of a secondary market, in which so-called “factoring” companies acquire the rights to receive future payments from settlement recipients. Id. Since 1997, thirty-eight (38) states have enacted Structured Settlement Payment Acts (“SSPAs”) requiring that transfers of payment rights under structured settlements be subject to court approval. Id. Massachusetts passed its own version of an SSPA on January 12, 1991 by adding G.L.c. 231C.
Although they are not uniform, all of the SSPAs are derived from the same model legislation, and reflect the same basic legislative scheme.[9] Id. at 20. Since 2002, the Internal Revenue Code has supported state SSPAs by imposing a 40% federal excise tax if such a transfer does not receive the required court approval. Id. at 21. Congress has also sought to encourage structured settlement payments by excluding the amount of each periodic payment from the recipient’s income under IRC §104(a)(l). Id. .at 19. Congress endorsed the use of structured settlement agreements as a way of ensuring that injury victims would be assured of future income, while minimizing the risk that the injured person would squander a single cash payment and return to public assistance. Id.
Subsequently, structured settlements typically contained clauses preventing the assignment of future payments. Id. Nevertheless, the factoring market began to take off in the early 1990s, as factoring companies persuaded structured settlement recipients to trade future payments for immediate cash payments. Id. It became apparent that many factoring companies were exploiting settlement recipients by charging sharp discounts to individuals who were often not equipped to appreciate the steep terms of the transfer agreements that they were signing. Id. at 20.
Beginning with Illinois in 1997, state legislatures began to recognize the public policy benefits of protecting structured settlement recipients from factoring companies. Id. Factoring companies were found to have consistently employed high pressure sales to buy a settlement, often at a time when an injury victim was vulnerable for exploitation. Id. State legislatures found that factoring companies were effectively undermining the very purpose of structured settlements, namely to provide long-term protection to injury victims and their families. Id.; see also Sponsor’s Statement to N.J. Assembly Bill 2146, subsequently enacted as the New Jersey SSPA, quoted in In re Transfer of Structured Settlement Rights, 803 A.2d 172, 175 (N.J. Super.Ct. 2002) (. . . the legislation “protects recipients of long-term structured settlements from aggressive marketing by factoring companies seeking to persuade these people to cash out future payments at sharp discounts”); see also 2002 Sess. Law News of N.Y., Legis. Mem. ch. 537, McKinney’s, Assembly Mem. in Support of A6936A, subsequently enacted as the New York SSPA (“[T]his market in the buying and selling of injured individuals’ payment streams can pose a hazard to existing recipients of structured settlements and to the public assistance programs on which recipients must often rely, once they have traded away secure income from structured settlements”).
2. Transfer of Structured Settlement Payment Rights: Court Approval
Under the Transfer Act,
a) No direct or indirect transfer of structured settlement payment rights shall be effective, and no structured settlement obligor or annuity issuer shall be required to make a payment directly or indirectly to a transferee of structured settlement payment rights, unless the transfer has been authorized in advance in a final order of a court of competent jurisdiction or responsible administrative authority, such as an administrative lawjudge, based on the court’s or responsible administrative authority’s written express findings that:
(1) the transfer complies with the requirements of this chapter and will not contravene other applicable law;
(2) not less than ten days before the date on which the payee first incurred an obligation with respect to the transfer, the transferee has provided to the payee a disclosure statement in bold type, no smaller than 14 points, specifying:
(i) the amounts and due dates of the structures settlement payments to be transferred;
(ii) the aggregate amount of the payments;
*114 (iii) the discounted present value of the payments, together with the discount rate used in determining the discounted present value;
(iv) the gross amount payable to the payee in exchange for the payments;
(v) an itemized listing of all brokers’ commissions, service charges, application fees, processing fees, closing costs, filing fees, referral fees, administrative fees, legal fees, notary fees, and other commissions, fees, costs, expenses and charges payable by the payee or deductible from the gross amount otherwise payable to the payee;
(vi) the net amount payable to the payee after deduction of all commissions, fees, costs, expenses and charges described in clause (v);
(vii) the quotient, expressed as a percentage, obtained by dividing the net payment amount by the discounted present value of the payments, which shall be disclosed in the statement as follows: “The net amount that you will receive from us in exchange for your future structured settlement payments represent_% of the estimated current value of the payments”;
(viii) the effective annual interest rate, which rate shall be disclosed in the statement as follows: “Based on the net amount that you receive from us and the amounts and timing of the structured settlement payments that you are turning over to us, you will, in effect, be paying interest to us at a rate of_% per year”; and
(ix) the amount of any penalty and the aggregate amount of any liquidated damages, including penalties payable by the payee in the event of a breach of the transfer agreement by the payee;
(3) the payee has established that the transfer is in the best interests of the payee and the payee’s dependents;
(4) the payee has received, or waived the right to receive independent professional advice regarding the legal, tax and financial implications of the transfer;
(5) the transferee has given written notice of the transferee’s name, address, and taxpayer identification number to the annuity issuer and the structured settlement obligor and has filed a copy of the notice with the court or responsible administrative authority;
(6) the transfer agreement provides that if the payee is domiciled in the commonwealth, any disputes between the parties shall be governed, interpreted, construed, and enforced in accordance with the laws of the commonwealth and that the domicile state of the payee is the proper place of venue to bring any cause of action arising out of a breach of the agreement; and
(7)the court or responsible administrative agency has made a determination that the net amount payable to the payee is fair, just and reasonable under the circumstances then existing.
See G.L.c. 231C, §2(a).
3. The “Best Interests” of Payee LeBlanc
Under the Transfer Act, the burden is on LeBlanc to establish that the transfer is in his best interests. G.L.c. 231C, §2(a)(3). The Legislature has not defined “best interests” of the payee in the statute, nor has it given specific factors for the Court to examine. However, decisions of other jurisdictions help illuminate this particular issue, and provide the Court with some guidance.
In New York several courts have cited legislative history suggesting that SSPA transfers should only be approved when the payee is experiencing “true hardship” caused by “an unforeseeable change in circumstances.” See In re 321 Henderson Receivables Ltd. Partnership, 2 Misc.3d 463, 468, 769 N.Y.S.2d 859, 863 (N.Y.Sup.Ct. 2003) (denying transfer as payee’s condition was not an unforeseeable change in circumstances); see also In re Settlement Funding of New York, LLC, 195 Misc.2d 721, 725, 769 N.Y.S.2d 816, 819 (N.Y.Sup.Ct. 2003) (proposed transfer was not in payee’s best interests as payee was not in “desperate straits”).
Other jurisdictions have adopted a bright-line “emergency assistance” standard in order to approve transfers. See Cavallaro v. Safeco Assigned Benefits Co., 25 Conn. L. Rptr. 649, 1999 WL 1126320 (Conn.Super. 1999) (unreported opinion) (rejecting an application from an unemployed person on social security benefits who was seeking a lump-sum cash payment in order to buy a condominium, because although the payee’s desire was “likely in his best interests,” the payee had “not shown a reason for the assignment that comported with the purpose of the statute, which is to provide emergency assistance to those payees of a structured settlement agreement that are in immediate financial need”); see also Grieve v. General American Life Ins. Co., 58 F.Sup.2d 319, 324 (D.Vt. 1999) (rejecting the proposed assignment, finding that the plaintiff, who was in substantial financial need, was asking the court “to enforce a transaction which will place her in significantly greater financial need, by cutting her income stream in half for the next fifteen years”); compare Rumbin v. Utica Ins. Co., 254 Conn. 259, 264, 757 A.2d 526, 529 (2000) (approving the proposed assignment as in the best interests of the plaintiff to avert pending threat of foreclosure on plaintiffs home).
Other courts have adopted a more flexible approach. For example, in Settlement Capital Corp. v. State Farm Mut. Auto. Ins. Co., 646 N.W.2d 550, (2002), the Court of Appeals of Minnesota rejected the trial court’s finding that “best interests” should be *115 limited to medical or other dire emergencies, and held that there should be a
more global consideration of the facts, circumstances, and means of support available to the payee and his or her dependents. These considerations would include, among other case specific factors, the reasonable preference of the payee, in light of the payee’s age, mental capacity, maturity level, and stated purpose for the transfer.
Id. at 556. The Minnesota Court of Appeals held that a trial court should also: (1) consider whether the periodic payments of the structured settlement were intended to cover future income loss or future medical expenses; (2) whether the payee has means of support aside from the structured settlement to meet these obligations; (2) whether the offered discount rate is in line with the market rate for similar transfers; and (3) whether the transfer is in the best interests of the payee’s dependents, which may involve an assessment of whether the payee can meet the financial needs of and obligations to the payee’s dependents if the transfer is allowed to proceed. Id. See also In re Settlement Capital Corp., 1 Misc.3d 446, 454, 769 N.Y.S.2d 817 (N.Y.Sup.Ct. 2003) (declining to adopt a “best interests” standard that is defined according to “desperate or dire straits” or a “life or death emergency,” and adopting the Minnesota Court of Appeals test).
A New York trial court has suggested that a court should consider: (1) the payee’s age, mental capacity, physical capacity, maturity level, independent income, and ability to support dependents; (2) purpose of the intended use of the funds; (3) potential need for future medical treatment; (4) the financial acumen of the payee; (5) whether payee is in a hardship situation to the extent that he or she is in “dire straits”; (6) the ability of the payee to appreciate financial consequences based on independent legal and financial advice; (7) the timing of the application. See In re Settlement Funding of New York, LLC, 2 Misc.3d 872, 876, 774 N.Y.S.D.2d 635, 638-39 (N.Y.Sup.Ct. 2003).
As a preliminary matter, it is clear that this Court is not required to make an affirmative finding based solely on conclusoiy allegations contained in an application, and is required to carefully scrutinize LeBlanc’s reasons for wanting the Transfer Agreement, and its terms and conditions. This Court recognizes that the public policy aim of structured settlements is to provide the security of long-term periodic payments to the injury victim, rather than an all-cash lump-sum payment that has the attendant risk of dissipation. That is especially true when, as here, the individual was a minor age eight (8) at the time of settlement. Although LeBlanc, age twenty-two (22), is no longer a minor, this Court is mindful of the fact that he is young and appears to be inexperienced and unsophisticated in financial matters, and is thus especially vulnerable to the high-pressure tactics employed by companies such as Seneca.
LeBlanc has already sold a portion of his structured settlement payments and is now before the Court seeking to transfer more of his future periodic payments for immediate cash. When asked what he would do if he ran into financial problems again, LeBlanc indicated that he might sell more of his structured settlement payments. LeBlanc has already received a $20,000 cash payment on October 29,2002, pursuant to the Settlement, and another payment of approximately $10,000 in 2003 when he sold a portion of his monthly payments. Despite these cash infusions and monthly payments, LeBlanc appears to have little to show for it, and is now back before the Court again attempting to sell more of his structured settlement. Furthermore, upon questioning from the Court it was apparent that LeBlanc did not understand the meaning of the term structured settlement, and that he was unaware of what he would be giving up in return for a cash payment from Seneca.
It is particularly disquieting to the Court that LeB-lanc has not sought any independent professional advice from an attorney or accountant regarding the legal, tax and financial implications of the proposed transfer. LeBlanc’s response to a direct question as to why he had not sought independent legal advice, “I just think I ought to do this myself, I guess. I don’t know,” betrayed a lack of understanding as to why it might be appropriate to do so. At the hearing, it appeared as though Seneca’s counsel was advocating for LeBlanc, although counsel could hardly be described as a disinterested and impartial advocate.
This Court is concerned that LeBlanc’s actions clearly demonstrate that he does not have the maturity, financial responsibility, or understanding of the consequences of his actions that is necessary to ensure that he will not be back before this Court again in the future attempting to sell more payments. Indeed, any financial hardship experienced by LeBlanc could be easily attributable to the fact that his previous selling of a portion of his structured settlement reduced his monthly tax-free payments from $823.00 to $523.00 a month. This is precisely this kind of result that the SSPÁs were designed to avoid. LeBlanc is working part-time at present and could conceivably increase the number of hours he works per week if he needs more money. As LeBlanc lives with his girlfriend who is gainfully employed, and he is also receiving monthly tax-free payments of $523.00 from the Settlement, he is not without the means to support himself, buy a new transmission for his car, and pay for his rent.
LeBlanc has indicated that he also needs a lump-sum payment now in order to pay for classes at the local community college. However LeBlanc testified that he did not know how much his tuition would cost and had not even sent an application to the college. In addition presumably LeBlanc could apply for either federal or private loans to help him pay for his tuition. *116 Even if he did not qualify for federal loans, private loans could be borrowed at an interest rate of roughly 9%, which is considerably less than the 16% effective interest rate that LeBlanc would be paying to Seneca. LeBlanc does not appear to have seriously considered going to school, as he has not taken any concrete steps towards the fulfillment of that goal. As such, the Court does not give weight to his stated desire to go to school, a desire which was not mentioned at all in his affidavit that was presented to the Court by Seneca.
Whether this court subscribes to the true hardship/desperate straits test or the more global consideration of the facts, circumstances, and means of support available to the payee, as articulated by the Minnesota Court of Appeals in Settlement Capital Corp., it is clear that LeBlanc has failed to meet his burden of proving that the Transfer Agreement is in his best interests under either test. To approve the Transfer Agreement would prove extremely detrimental to LeBlanc’s future financial position, and is contrary to the public policy of the statute. Therefore, this Court finds that LeBlanc has not met his burden of proving that the Transfer Agreement is in his best interests.
4. The Payment: Fair, Just and Reasonable?
Even if this Court were to find that the Transfer Agreement was in LeBlanc’s best interests, which this Court does not find, this Court is required to make an independent assessment that the “net amount payable to the payee is fair, just and reasonable under the circumstances then existing.” G.L.c. 231, §2(a)(7). The Disclosure Statement reveals that under the terms of the Agreement, LeBlanc would in effect be borrowing money from Seneca at an interest rate of 16.021%. Although not illegal, this interest rate is punishingly high given current market conditions which indicate a national average mortgage rate of 6.28% on a thirty (30) year mortgage and 6.01% on a fifteen (15) year mortgage. Indeed, the effective interest rate charged by Seneca more closely approximates the interest rate on credit cards and other unsecured loans. In addition, the net amount to be received by LeBlanc from Seneca in exchange for the Transferred Payments represents only 38.802% of the estimated current value of the payments, which is a very steep discount under any analysis. As such, this court finds that the net amount payable to LeBlanc is not “fair just and reasonable” under G.L.c. 231, §2(a)(7).
ORDER
For the aforementioned reasons, Seneca’s application for approval of the proposed transfer of structured settlement payment rights is hereby DENIED.

Seneca One, LLC, 7920 Norfolk Avenue, Suite 300, Bethesda, MD 20814.

LeBlanc et al. v. Marderosian et al. WOCV86-35232.

This amount was paid to and received by LeBlanc.

These payments are being paid; except at some time during the payment period LeBlanc accepted approximately $9,500 for $40,000 in future payments, and as a result he now receives $523.00 per month instead of $823.00. The present petition does not deal with the remaining payments of $823.00 due until 2012, but does relate to the payments which are to commence in the year 2012, five years from now.

Counsel for Seneca stated at the hearing that Prudential Insurance Company had consented to the granting of the application.

Douglas Evans, Esq., Kroll, McNamara, Evans & Delehanty, West Hartford, Connecticut.

In Massachusetts contracting for an interest rate of more than 20% is usury. G.L.c. 271, §49.

LeBlanc’s statement at the hearing contradicts the terms of the Agreement which states that LeBlanc would receive one hundred and twenty (120) monthly payments of $823.00 each, guaranteed for ten (10) years, commencing on or about October 29, 2002, through and including September 29, 2012.

Each of the current SSPAs are derived from one of several versions of the Model Structured Settlement Protection Act developed by the National Structured Settlements Trade Association.